A00A2000. IN THE INTEREST OF J. J. W., a child.
(545 SE2d 21)

JOHNSON, Presiding Judge.

The father of J. J. W. appeals from a juvenile court order terminating his parental rights. We affirm the trial court's order to the extent it terminated the father's parental rights. However, we vacate the order insofar as it places permanent custody of the child with the Georgia Department of Human Resources and remand the case with direction that the juvenile court, in conjunction with the Department of Human Resources, evaluate the possibility of placing the child with a suitable relative.

On appeal, we view the evidence in a light most favorable to the juvenile court's order and determine whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights should have been terminated; we do not weigh the evidence and must defer to the trial judge as the factfinder.[1]

The decision to terminate parental rights involves a two-step process. First, the juvenile court must determine whether there is clear and convincing evidence of parental misconduct or inability, as defined in OCGA § 15-11-94 (b). Parental misconduct is found when the child is deprived, the cause of the deprivation is lack of proper parental care or control, the cause of the deprivation is likely to continue or will not likely be remedied, and the continued deprivation will cause or is likely to cause serious harm to the child.[2] Second, if the juvenile court finds clear and convincing evidence of parental misconduct or inability, it must consider whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[3]

---

[1] *In the Interest of D. L. N.,* 234 Ga. App. 123, 125 (2) (506 SE2d 403) (1998).
[2] OCGA § 15-11-94 (b) (4) (A).
[3] OCGA § 15-11-94 (a); *In the Interest of B. D.,* 236 Ga. App. 119 (511 SE2d 229) (1999).

Viewing the evidence in favor of the juvenile court's findings, the record shows that the Houston County Department of Family & Children Services (the "department") received custody of J. J. W. on August 20, 1997, when he was two days old. J. J. W. was taken directly from the hospital where he was born because his mother was incarcerated on a probation violation for drug use and his father had "demonstrated mental instability and a tendency toward violence in the past ninety days." During an adjudicatory hearing on September 3, 1997, the mother and father admitted that the child was "in a general state of deprivation."

On August 29, 1997, the department formulated a reunification case plan for the father. On November 25, 1997, the department reviewed the father's progress and found that he had not met some of the case plan goals. The evidence further showed that when the mother got out of jail, she returned home to the father and he physically assaulted her, resulting in his incarceration at Central State Hospital. A May 26, 1998 review of the father's case plan goals showed that the father was in Central State Hospital and was possibly going to jail for two years. The department requested a hearing for a nonreunification case plan to be entered for the father based on the following facts: (1) he failed to comply with his case plan; (2) he had a warrant for his arrest due to a probation violation; (3) he was asked to leave a homeless shelter due to noncompliance with shelter rules and outward aggression toward other residents; and (4) a psychological evaluation indicated that treatment was not likely to be successful.

J. J. W. lived in foster care until July 1, 1998, when he went to live with his mother at a drug rehabilitation center. However, in November 1998, the father enticed the mother to leave the facility by claiming he would give her a ride to work. Instead, the father continued past the mother's job site, and the two stayed together and used crack cocaine for three or four days. During this time, the father allegedly physically abused the mother. In the interim, J. J. W. was abandoned at the rehabilitation center, and the department subsequently returned him to foster care. The father acknowledged that he persuaded the mother to leave the rehabilitation center and gave her crack cocaine.

A nonreunification case plan for the father was established on August 25, 1998. A nonreunification hearing for the father was once again requested on October 6, 1998, due to the father's failure to cooperate with the department and his history of mental instability.

The judicial citizens review panel recommended termination of both parents' parental rights, and the department filed a petition to terminate parental rights on December 22, 1998. Since the father's whereabouts were unknown, the department sought and received an

order to serve him with notice of the termination petition by publication. Service by publication was accomplished by March 10, 1999.

On April 21, 1999, the juvenile court conducted a hearing on the department's termination petition. The father did not appear at the hearing, and his attorney advised the juvenile court that he had lost contact with the father. The mother testified that she had recently spoken with the father on several occasions, that he was aware of the hearing, but that he "didn't think he was going to make it." Following the hearing, the juvenile court entered an order declining to terminate the parental rights of the mother because she had demonstrated some progress in complying with her case plan goals and continuing the matter as to her parental rights for a period not to exceed six months. The juvenile court, however, entered a separate order on April 26, 1999, terminating the father's parental rights based on (1) the father's admission by letter that he is not in a position to be a parent; (2) the father's failure to have any meaningful contact with J. J. W. for at least a year preceding the filing of the petition; (3) his failure to support J. J. W. in any way; (4) his history of mental illness; and (5) his failure to appear at the termination hearing despite the fact that he had legal and actual notice of the hearing.

On June 28, 1999, the father filed a motion requesting that the juvenile court set aside its order terminating his rights because he did not receive actual notice of the hearing. The court took judicial notice of its previous orders, none of which had been appealed. In addition, during the hearing on this motion, the department submitted evidence showing that since the last order had been entered, the father and mother had been charged with theft of a gun and the mother was additionally accused of offering the victim money to drop the charge. And, the father and mother were arrested on this charge following a traffic stop in a "drug-infested area." As of the termination hearing, the criminal charges were still pending against both the father and mother.

Based on the history of the case and the additional evidence, the court terminated the parental rights of both the father and the mother. The father's rights were terminated based on (1) his actions to destroy the relationship between the mother and child and to sabotage the mother's attempts to remain drug free; (2) his history of being admitted to mental hospitals and his concession that he has some mental impairment; (3) his bizarre behavior and testimony during the hearing; (4) his apparent neglect for the welfare of his child (as evidenced by the fact that he lured the mother from her rehabilitation center and left the child alone); (5) his actions in taking the mother, who had $4,700 in cash in her possession, to a known drug area; (6) his failure to abide by his case plans; and (7) his failure to provide any money toward the support and maintenance of the child.

The father appeals this order.

1. The father contends there was not clear and convincing evidence of his parental misconduct or inability. He further contends that the court erred in considering the issue of child support because there was never any child support order requiring him to make such payments. Pretermitting the question of whether the juvenile court erred in considering the father's failure to provide any support or maintenance for the child, the evidence is sufficient to show that the continued deprivation of J. J. W. is likely to continue or will not likely be remedied. First, evidence of past conduct may be considered in determining whether the deprivation is likely to continue if the child is returned to the father.[4] The past conduct of the father in this case certainly justifies such a finding. Second, the record is replete with examples of the father's failure to cooperate with the department's case plan and with acts of physical aggression by the father.

While the father promises to change his life, this court has repeatedly recognized that "[t]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[5] Based on the father's past behavior, the length of time his problems have persisted, the psychiatrist's testimony that treatment is not likely to have any benefit, the father's failure to comply with case plan goals, and his own admissions, the juvenile court properly terminated the father's parental rights.

2. The father argues that the juvenile court erred in placing J. J. W. in the department's permanent custody for purposes of adoption without considering placement of the child with a relative. We agree.

The issue of placement with relatives is one to be made by the juvenile court, together with the department, following the juvenile court's decision to terminate parental rights.[6] According to the statute, "[a] thorough search for a suitable family member shall be made by the court and the Department of Human Resources in attempting to effect this placement."[7]

In the present case, there is no evidence that the department investigated any relatives as possible suitable placement for J. J. W. While the father did not specifically identify any relatives to be considered, he did testify that he believed a suitable relative placement could be found. Moreover, according to the clear dictates of the statute, it is incumbent upon the court and the department to conduct a

---

[4] See *In the Interest of B. D.*, supra at 121 (2).

[5] (Citation and punctuation omitted.) *In the Interest of S. J. C.*, 234 Ga. App. 491, 494 (1) (507 SE2d 226) (1998).

[6] OCGA § 15-11-103 (a) (1); *In the Interest of D. T.*, 221 Ga. App. 328, 330 (2) (471 SE2d 281) (1996).

[7] OCGA § 15-11-103 (a) (1).

thorough search for a suitable family member. The record does not show that such a search was ever conducted.

Thus, while we affirm the trial court's termination of the father's parental rights, we find that the permanent placement of the child with the Department of Human Resources was premature in the absence of an investigation by the court and the department into whether a suitable placement with relatives could be made. We, therefore, vacate that part of the juvenile court's order which makes permanent the placement of the child with the department pending a decision that there is no suitable alternative placement for the child within the family.[8] We remand the case to the juvenile court with direction that the juvenile court, in conjunction with the Department of Human Resources, evaluate the possibility of placing the child with a suitable family member. In so doing, we do not express any belief that the child must or should be placed with any family member.

*Judgment affirmed in part and vacated in part and case remanded with direction. Smith, P. J., and Phipps, J., concur.*

DECIDED JANUARY 18, 2001 —
RECONSIDERATION DENIED FEBRUARY 5, 2001.

*Mark S. Martin,* for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General, Walter G. Sammons, Jr.,* for appellee.

---

[8] See *In the Interest of N. B.*, 239 Ga. App. 336, 339 (2) (521 SE2d 47) (1999).