560 S.E.2d 738 (2002)
253 Ga. App. 887
In the Interest of B.F., a child.
No. A01A2392.
Court of Appeals of Georgia.
February 21, 2002.
*739 O'Brien & Koontz, David J. Koontz, Marietta, for appellant.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Asst. Atty. Gen., Sanders B. Deen, Marietta, for appellee.
POPE, Presiding Judge.
The father of B.F. appeals following the termination of his parental rights. He asserts that there was insufficient evidence to support the juvenile court's order. We agree and reverse.
In determining whether a termination of parental rights is supported by sufficient evidence, we construe [the] evidence and all reasonable inferences from it in a light most favorable to the trial court's ruling and ask whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights had been lost.
(Citation omitted.) In the Interest of J.E. L., 223 Ga.App. 269(1), 477 S.E.2d 412 (1996).
Viewed in that light, the evidence at the termination hearing showed that in February 1999, the father was arrested on a charge of driving with a suspended license. At the time, B.F. was living with the father and the mother's whereabouts were unknown, so the child was placed in the custody of the Department of Family & Children Services. A review hearing was scheduled with regard to B.F. on June 1, 1999, but when the father failed to appear, the juvenile court issued an arrest warrant. After the father explained that he was incarcerated at the time of the June hearing, he was released from jail on the warrant.
At a later hearing on October 5, 1999, the juvenile court found that the father had failed to comply with the court's March 8, 1999 order in that he had failed to seek and maintain full-time employment; he had failed to maintain a stable home for a period of six months; he had failed to have a complete drug and alcohol assessment and to follow the recommendations of that assessment; and that he had failed to complete parenting classes. On January 18, 2000, the father failed to appear for another review hearing. The juvenile court found him to be in wilful contempt and issued a second arrest warrant. The father testified that he never received notification of this hearing. He was released from that warrant after accepting service of the petition for termination of his parental rights.
The hearing on the petition for termination was held over a period of two days in October and November 2000. A DFACS caseworker testified that after coming into the department's custody, B.F. was placed in a foster home until August 2000 when he went to live with his paternal grandparents. While in foster care, B.F. received counseling and was placed on Ritalin to help with his school grades. A DFACS caseworker testified that since being placed with his grandparents, B.F. had been doing well. He was taken off Ritalin, but planned to continue with counseling. He was receiving tutoring to help with two of his classes, and the caseworker said he seemed "focused and excited about school." She stated that the counseling was to assist B.F. in showing his emotions and feelings as he tended to suppress them. The focus of this counseling is at least partially attributable to an incident where B.F. burst into tears during a visit with his father. The caseworker admitted, however, that B.F.'s reaction to seeing his father by bursting into tears may have been an indication that he loved and missed his father.
Between the time B.F. was taken into DFACS custody and the termination hearing, the father had visited him five times, three of which occurred within one and one-half months before the termination hearing in October 2000. The father had attempted to visit the child on one other occasion, his birthday on March 31, 2000, but the child already had plans for the day. The caseworker attempted to reschedule, but informed the father that there was an outstanding arrest warrant for him. She told the father that DFACS would have to contact the authorities if that remained outstanding.
*740 The father said that he would try to clear that up and contact her a few days later. She did not hear from him.
The caseworker stated that the father had never presented any verification that he had completed a parenting class or substance abuse assessment as ordered by the court. But she admitted that B.F. was taken into custody due to his father's arrest and not based upon any evidence of abuse or drug use. The caseworker also testified that the father had never provided DFACS with an address where he was living, nor had he attempted to make any financial contributions to B.F.'s support. But she conceded that the father had been in jail for a significant amount of time since January 1999, which may have affected his ability to contribute financially or to comply with the court's order.
The father filed a petition to legitimate B.F. in connection with the termination proceedings, and the juvenile court granted that petition. He had never previously made any attempt to legitimate B.F. and had never attempted to legitimate A.F., his other child, who resided primarily with her mother. The father testified that he had been residing in a three-bedroom trailer for a period of six months prior to the hearing, although by the time of the November hearing date, he had moved into a two-bedroom trailer with a friend. He stated that he could obtain access to a three-bedroom trailer at anytime if B.F. came to live with him.
Prior to living in the trailers, the father had been in jail off and on. The father spent from six to nine months in jail in 1999 on the suspended license charge and the resulting probation violation, and other jail time was attributable to the arrest warrants issued by the juvenile court. He was released from jail in January 2000.
At the time of the hearing the father was employed with a tree service company, but received no health benefits. The father admitted that he made no attempt to support B.F. financially since the child was placed in DFACS custody because no one ever mentioned anything to him about making payments. He later stated that he had tried to give B.F.'s stepgrandmother some money towards the child's support, but that she had refused to take it.
The father stated that he never attended any parenting class because he did not need to. He described himself as a good parent and said that he "didn't need to go sit in an office and have people tell me what I was and what I wasn't." But at the second hearing date, he stated that he had tried to attend parenting classes while in jail, but that they had been suspended. He stated, however, that if he got custody of B.F. back he would do anything he was asked to do, including attending classes.
The child's paternal stepgrandmother testified that B.F. was living with her husband and her at the time of the hearing. She stated that the child had lived with them previously in 1995 "when neither parent was available." At that time, they were called in the middle of the night to pick up B.F. and A.F. by the Cobb County police. They kept them for several months, before the father came for a visit. The stepgrandmother testified that B.F.'s current stay with them was going well and that she believed that he would benefit by staying longer. Prior to the current stay, the grandparents had not known for four years where their grandchildren were.
At the close of the evidence, B.F.'s guardian ad litem stated that he could not recommend the termination of the father's parental rights at that time because he could not say it was in the child's best interest.
The juvenile court employs a twoprong analysis for determining whether parental rights should be terminated under OCGA § 15-11-94. "First, the court determines whether there is clear and convincing evidence of parental misconduct or that the parent is unable to care for and control the child. Second, the court determines whether termination is in the best interest of the child." (Citations omitted.) In the Interest of S.H.P., 243 Ga.App. 720, 534 S.E.2d 161 (2000).
A finding of parental misconduct requires clear and convincing evidence of the following four factors:

*741 1) that the child is deprived; 2) that the cause of the deprivation is a lack of proper parental care or control; 3) that the cause of the deprivation is likely to continue or will not likely be remedied; and 4) that the continued deprivation is likely to cause physical, mental, emotional, or moral harm to the child. OCGA § [15-11-94](b)(4)(A).
(Citation and punctuation omitted.) In the Interest of J.M. B., 231 Ga.App. 875, 876, 501 S.E.2d 259 (1998).
In this instance, the father is bound by the trial court's prior finding of deprivation because he did not appeal it. In the Interest of L.H., 236 Ga.App. 132, 134(1), 511 S.E.2d 253 (1999); In the Interest of E.C., 225 Ga.App. 12, 14-15, 482 S.E.2d 522 (1997).
The initial cause of that deprivation can be directly attributed to the father's incarceration at the time B.F. came into DFACS custody. As the father was in jail for six to nine months during 1999, he was unable to care for B.F., and the mother's whereabouts were unknown.
Nevertheless, there must also be clear and convincing evidence that the cause of that deprivation is likely to continue. Here, the evidence showed that the father had served his time and resolved his legal issues, thus clearing the way for him to obtain a driver's license. Accordingly, there was no evidence to show a likely recurrence of the father's incarceration. And incarceration, in the absence of aggravating factors, does not automatically compel the termination of parental rights. See In the Interest of M.C.L., 251 Ga.App. 132, 134(1)(a), 553 S.E.2d 647 (2001).
The juvenile court did rely, however, upon several additional factors in its finding of parental misconduct or inability on the part of the father. The court found that the father "excessively uses or has a history of chronic unrehabilitated abuse of intoxicating liquors or dangerous drugs or controlled substances with the effect of rendering the father incapable of providing adequately" for the child. But we find no evidence in the record to support such a finding. The evidence showed that the father received two convictions for DUI in approximately 1991 or 1992, which led to the suspension of his driver's license. But there was no evidence of any chronic alcohol or drug abuse in the intervening seven to eight years. Certainly, the DFACS caseworker testified that drugs and alcohol played no factor in 1999 when the department took custody of B.F. The only evidence as to the father's alcohol consumption was his own testimony that he drank no more than a 12 pack of beer per month. And B.F.'s mother testified that she had never known the father to abuse drugs during the time they spent together.
The juvenile court also found that the father failed to support B.F. and failed to comply with the court's order. While it is true that the father did not provide any financial support while B.F. was in DFACS custody, he testified, without contradiction, that he did attempt to contribute money while his child was in his parents' care. And while there is no evidence that the father had attended parenting classes or obtained a drug or alcohol evaluation as required by the court's order, there was evidence that during the periods between his incarcerations and afterward, the father maintained a job in a tree service. In addition, there was evidence that he had made attempts to find a suitable home for B.F.
The last factor upon which the juvenile court relied was a finding that the father had failed to develop and maintain a parental bond with B.F. in a meaningful, supportive manner. Both parents testified, however, that a strong bond existed between B.F. and his father. The father had cared for B.F., with the exception of one period of several months, from the time he was three months old until the time he went into DFACS custody. The parents testified that they saw to B.F.'s health and that the father was very involved in the child's life and schooling. They also testified that the child made good grades in school while under the father's care, with no recommendation that he be placed on Ritalin. This evidence was uncontradicted. And the evidence showed that after his final release from prison, he began visiting B.F., albeit sporadically at first. Based upon our review of the record, therefore, we cannot say that there was clear and *742 convincing evidence to support a finding that the cause of the deprivation was likely to continue.
And even if there were sufficient evidence to support a finding of continued deprivation, termination of the father's parental rights would not be warranted because there is absolutely no evidence in the record that any continued deprivation is likely to cause physical, mental, emotional, or moral harm to the child. There was no testimony that any potential or actual harm would result to B.F. from a continued relationship with his father or that B.F. was suffering from being in foster care or that he would suffer if he did not find permanent placement.
Accordingly, the juvenile court's termination of the father's parental rights must be reversed. See In the Interest of D.F., 251 Ga.App. 859, 555 S.E.2d 225 (2001); In the Interest of J.M., 251 Ga.App. 380, 554 S.E.2d 533 (2001).
Judgment reversed.
BLACKBURN, C.J., and MIKELL, J., concur.