A03A1146. IN THE INTEREST OF G. B., a child.

(588 SE2d 779)

SMITH, Chief Judge.

The mother of G. B. appeals from the juvenile court's order terminating her parental rights. She argues that the evidence does not support the court's decision, that the juvenile court failed to make certain required findings, and that the Department of Family and Children Services failed to seek adequate alternatives to termination. We find no basis for reversal, and we affirm.

1. We first address the mother's contention that the evidence was insufficient to terminate her parental rights. On appeal of a juvenile court's order terminating a parent's rights in his or her child, we do not weigh the evidence or determine witness credibility, and "we view the evidence in a light most favorable to the juvenile court's order and determine whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights should have been terminated." *In the Interest of C. N. H.*, 238 Ga. App. 50 (517 SE2d 589) (1999).

So viewing the evidence, the record shows that the Lamar County Department of Family and Children Services (the department) took custody of G. B. in May 1998, when G. B. was 11 months old, as a result of the mother's altercation with her 13-year-old son, L. J., who was living with his grandmother.[1] G. B. was removed from her mother. The mother subsequently regained custody, but in February 2000, the department opened a supervision case by order of the juvenile court as a result of another domestic dispute involving L. J. This incident included G. B.'s maternal grandmother and the mother's sister. The mother was present with G. B., and the juvenile court's order required the mother to stay away from L. J. and the grandmother's home.

G. B. was removed from her mother a second time, on August 29, 2000, again because of an altercation between the mother and L. J. In addition, the mother was "using alcohol to excess." At that time, the department was unable to establish an address for the mother. G. B. was placed in emergency care. The mother failed to appear at a hearing scheduled August 30, 2000, and the department was granted temporary custody of G. B. Between August 30, 2000, and August 16, 2002, the date the termination petition was filed, the department developed at least three reunification plans, all of which required the mother to visit with G. B., to pay child support, to remain drug and

---

[1] The department was first involved with the mother in May 1994, with respect to the mother's unborn child. The department had received complaints that the mother was drinking alcohol while pregnant and was not obtaining proper prenatal care. That child was placed in foster care after his birth and died while in foster care.

alcohol free, and to cooperate with the department. The latter two plans further required the mother to find employment and to find her own home.

During the department's involvement with the mother and G. B., it funded the deposit and first month's rent on an apartment home. The mother lost her job, however, and was unable to maintain that apartment. The department also assisted her with transportation, child care, and an employment search, and it helped her obtain Medicaid. It further funded drug screens, made referrals for substance abuse assessments, parenting classes, AA meetings, and anger management counseling. In addition, the department placed the mother and G. B. in a residential substance abuse program, which the mother did not complete. She was asked to leave the program because she did not comply with agency rules. Because the mother did not complete the residential program, the department filed a contempt action on May 21, 2001. Although the juvenile court judge directed the mother to return to the program and complete it, she failed to do so.

Officer Mark Evans testified concerning a number of domestic incidents at the home of the grandmother. On January 19, 2002, in response to an emergency call, he went to the residence and "smelled a strong odor of alcohol" on the mother. A few days later, he returned to the home following another emergency call, and the mother was "very intoxicated." Both visits concerned the child's putative father. The first call involved a "suspicious vehicle" in the area, and the second resulted from a report that G. B.'s father was entering the house through a window.

On February 2, 2002, Evans returned to the residence. He testified that "[t]he mother and [grandmother] were fighting." L. J., the mother's juvenile son with whom she previously had at least two altercations, and the putative father were present. Evans could smell alcohol on the father; he "was not able to stand on his feet at that time." Evans went to the home two days later, following the mother's report that the father was trying to enter the house. She told Evans that the father "would not leave her alone." Evans testified that she was drunk. The father was arrested that day for disorderly conduct. Evans went to the home on February 7 in response to yet another domestic dispute; the grandmother wanted both the mother and the father to leave the residence. Apparently the home was quiet for approximately five months, but on July 3, 2002, Evans responded to another call at the residence. The mother, L. J., the grandmother, and a related juvenile "were all fighting." The mother testified at the hearing that L. J. has "a really violent temper about him."

G. B.'s caseworker testified that the department "had some pretty extensive history with" L. J. and his grandmother. The case-

worker stated that the mother had paid no child support on behalf of G. B. and had failed to maintain "a home on her own that we can determine for a period of six months as the case plan requires. Basically her circumstances pose the same types of risks to the child as they did three years ago. We can't seem to provide enough services or to assist her in causing these risks to be alleviated." The caseworker had seen the mother at the grandmother's home several times in the preceding four months, and she stated that the mother had told her "she was going to be around her mother and that [G. B.] was going to be around her mother and [L. J.] and that there was nothing that we could do about it."

According to this witness, the department was concerned that the mother continued to use alcohol and she was

> still around a lot of domestic violence at her mother's home . . . and that the child would be back in that situation again and we're concerned that the mother is for some reason not maintaining her own residence away from that environment. We're also concerned that [G. B.] will be unsupervised, that she'll be around a lot of domestic violence and that something really bad will happen to her.

The department was concerned that G. B., then five years old, would be harmed or returned to its custody, if the court did not terminate the mother's rights. She believed G. B.'s life would not "be stable until she receives a safe and permanent home."

Fact issues arose at the hearing as to whether the mother was living in her own residence, as required by her case plans. The mother testified that she had obtained her own apartment approximately four months before the hearing. The caseworker testified that she had been to the apartment on numerous occasions and never found the mother present. A few weeks before the hearing, the caseworker went with the mother to the apartment. The caseworker testified that she saw no food in the refrigerator and that the beds did not have mattresses on them. The mother told her she slept on the couch. The caseworker saw only two pots on the floor, and the only food in the apartment was one loaf of bread. She saw a few items of clothing draped across one of the bed frames and a few toiletry items inside the bathroom.

The mother missed approximately half her visitations during the six months preceding the hearing, often without informing the department beforehand. The caseworker stated that the mother "just wouldn't show up basically and the child would be present and she would get upset." She once cancelled a visit on G. B.'s birthday because she thought the weather was "too bad." Although the mother

did not own a car, the grandmother usually brought her to her visitations, and she lived less than two miles from the agency where visitations were scheduled. G. B. was not "in a pre-adoptive placement" at the time of the hearing, but the caseworker testified that she was capable of being adopted. G. B. was enrolled in special education classes in her school and was receiving mental health counseling.

The mother insisted that she had not drunk any alcohol since October 2000. She testified that people often misidentified her, confusing her with her sister. According to the sister, *she* was drinking at their mother's home, and she lied to the police concerning her identity. She testified that she identified herself as appellant to the police on more than one occasion. Officer Evans testified that he could tell the difference between appellant and her sister. Another officer who responded to one of the emergency calls at the grandmother's house testified that the intoxicated woman was appellant.

The mother explained that she ate fast food most of the time because it was "easier to stop and get a hamburger than try to come home from a hard day of work and cook." Photographs taken the day of the hearing were introduced into evidence, showing conditions within the apartment. She testified that she had contacted a local agency that was going to help her obtain mattresses, in addition to food and clothing for G. B. She also explained that she had talked with child support enforcement personnel and had attempted to have payments taken from her paychecks. The mother did earn her GED, and she completed a "fatherhood program" and obtained a forklift license. She testified that she had tried to work steadily, and she maintained the same job for almost six months before the hearing. She had earned approximately $5,000 at the time of the hearing. She explained that she missed visitation because she got off work at 4:00 p.m., and the department closed at 5:00 p.m. She stated that she had to walk "since they cut me off from my mom" and that she had no money for transportation. The mother testified that she had been trying to get the apartment ready for G. B. as steadily as she could on her limited budget. She stated she was "struggling as hard as I can to do what I can with what I've got and I just ain't got a lot right now, but I'm doing the best I can."

The guardian ad litem stated at the hearing that she had heard "evidence of substantial compliance" with all of the mother's case plan. She did not know whether G. B. would continue to be deprived, and she did not think she could "honestly say" that termination was in G. B.'s best interest. She stated that if the mother "continues to improve at the pace she's improved, I don't believe that child would be best served by being taken away from her. I don't know. I'm sorry, but I'm confused."

The decision to terminate parental rights is a two-step process. The juvenile court must first determine whether clear and convincing evidence exists of parental misconduct or inability. If such evidence exists, the court must then decide whether termination of the parent's rights is in the best interest of the child, considering the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home. OCGA § 15-11-94 (a).

*In the Interest of M. J. T.*, 255 Ga. App. 553 (565 SE2d 877) (2002). The court determines parental misconduct by finding that the child is deprived, that the lack of proper parental care or control is the cause of deprivation, that the cause of deprivation will likely continue or is not likely to be remedied, and that continued deprivation will or is likely to cause serious mental, physical, moral, or emotional harm to the child. OCGA § 15-11-94 (b) (4) (A) (i)-(iv).

The unappealed orders of the juvenile court placing G. B. into the department's custody when no other caregiver could be found for G. B. were sufficient to establish that G. B. was deprived within the meaning of OCGA § 15-11-94 (b) (4) (A). See *M. J. T.*, supra, 255 Ga. App. at 554. And the evidence showed that the cause of the deprivation was the mother's failure to provide proper care for G. B. In making this determination, one of the factors the juvenile court is required to consider is whether the parent exhibited "[e]xcessive use of or history of chronic unrehabilitated abuse of intoxicating liquors . . . with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child." OCGA § 15-11-94 (b) (4) (B) (ii). Here, although conflicting, evidence was presented that the mother continued to drink alcohol and to use it to excess in violation of her case plans.

In addition, because G. B. was not in the mother's custody, the juvenile court was authorized to consider whether the mother had maintained a supportive and meaningful parental bond with G. B., whether she provided child support for G. B., and whether she complied with her reunification plans. OCGA § 15-11-94 (b) (4) (C) (i)-(iii). Although she made progress toward completion of her reunification plans, evidence was presented on which the juvenile court could have found that she fell short of this goal. She missed a number of visitations with G. B. and provided no child support for the child. She continued to use alcohol in violation of the plans, and while she still had physical custody of G. B., she took the child to the grandmother's home, where she knew violence existed. Although she claimed to live in her own residence, given the dearth of furnishings and food, as well as the photographs of the residence taken on the day of the hear-

ing, the juvenile court was authorized to conclude that the apartment home was unsuitable. Sufficient evidence was presented on which the court could base its decision that the mother's lack of care caused G. B. to be deprived.

In deciding whether G. B.'s deprivation was likely to continue, the juvenile court was authorized to consider the mother's past conduct. *In the Interest of K. R. C.*, 235 Ga. App. 354, 355 (1) (510 SE2d 547) (1998); *In the Interest of J. S. G.*, 242 Ga. App. 387, 389 (1) (529 SE2d 141) (2000). Although the mother did make progress toward her case plan goals, again, the record shows that up until the time of the hearing, she paid no child support and only sporadically visited G. B. In addition, evidence was presented that despite the well-established pattern of violent behavior that occurred at the grandmother's home, the mother fully intended to allow G. B. to visit the grandmother.

Also, in determining whether a parent is presently unfit to care for a child, the juvenile court can consider whether a parent has "successfully demonstrated her ability to care for her other children. [Cit.]" *In the Interest of Z. B.*, 252 Ga. App. 335, 337-338 (1) (556 SE2d 234) (2001). Evidence was presented in this case that the mother was unable to care for her other child, L. J., who was violent. Given the mother's firm decision that she would continue to subject G. B. to violence at the grandmother's house, the mother's inability to control her other child, and her failure to comply with visitation and child support requirements, this case can be distinguished from *In the Interest of T. B.*, 249 Ga. App. 283, 286 (548 SE2d 45) (2001), cited by the mother, in which this court concluded that the evidence was insufficient to show that the mother's lack of proper care and control was likely to continue. Here, the evidence supported the juvenile court's conclusion that the cause of G. B.'s deprivation was likely to continue.

The same evidence also supported the conclusion that failure to terminate the mother's rights could cause serious harm to G. B. Contrary to the mother's argument that the juvenile court failed to make any "explicit factual finding" supporting its conclusion that continued deprivation would harm G. B., the court did find that G. B. "was around domestic violence at the grandmother's home." The court's order further recounted the fact that police responded to six domestic calls at the grandmother's house within the past year and that the mother was present at the home on all six occasions. In addition, the order recited that "the mother has had a history of fighting and domestic violence and that violence usually centered around fights between the mother and her older child . . . and was usually at the grandmother's home." Finally, the juvenile court stated in the order that the mother had told a caseworker that the department could not

stop her from going to her mother's home. Given the mother's insistence that she would allow G. B. to visit a home in which violence was prevalent, the department's concern about G. B.'s safety was well founded. Compare *In the Interest of J. H.*, 258 Ga. App. 211, 216 (573 SE2d 481) (2002) (no testimony showed that child would be harmed absent termination and no "explicit factual finding supporting" conclusion that child would be harmed); *In the Interest of B. F.*, 253 Ga. App. 887, 892 (560 SE2d 738) (2002) (no evidence that "potential or actual harm would result" if child continued relationship with appellant). Our law does not require a child to suffer serious injury before a parent's rights are terminated. *K. R. C.*, supra, 235 Ga. App. at 355. See also *M. J. T.*, supra, 255 Ga. App. at 554.

Finally, we must determine whether the record supports the juvenile court's conclusion that termination of the mother's rights is in G. B.'s best interest. As discussed in detail above, evidence was presented that the mother failed to remain alcohol free and that she insisted on allowing G. B. to frequent a violent household. Furthermore, she consistently failed to develop a strong parental bond with G. B., as she failed to attend regular visitations or to financially support G. B. The caseworker testified that G. B. needed a stable and permanent home. Evidence was presented that unless the mother's rights were terminated, this need would remain unmet. The same evidence that supported the juvenile court's conclusion that the mother was unable to care for G. B. also supported the conclusion that termination was in the child's best interest. See *C. N. H.*, supra, 238 Ga. App. at 53-54 (2).

The guardian ad litem did express doubt as to whether the mother's rights should be terminated, but we are not bound by those concerns. The juvenile court, who heard the witnesses testify and observed their demeanor, was the final arbiter of witness credibility. "While the mother's efforts to improve herself are good, the trial court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court." (Citation and punctuation omitted.) *Z. B.*, supra, 252 Ga. App. at 338 (1). The court obviously believed the testimony showing that the mother had not complied with the portion of her case plan requiring her to be alcohol free and that she intended to visit with her own mother, where G. B. could well be harmed by the violent behavior of the mother's older son and G. B.'s own father.

"The primary consideration in a proceeding to terminate parental rights is the welfare of the child. In determining how the interest of the child is best served, the juvenile court is vested with a broad discretion which will not be controlled in the absence of manifest abuse." (Citation and punctuation omitted.) *Z. B.*, supra, 252 Ga. App. at 339 (2). This is not a case in which a child's standard of living

is simply substandard, a factor that cannot, alone, serve as a basis for termination of parental rights. See *Shover v. Dept. of Human Resources*, 155 Ga. App. 38, 40 (1) (270 SE2d 462) (1980). Given the evidence concerning the mother's use of alcohol, her failure to complete her case plans, and her insistence that G. B. would continue to visit the grandmother's violent household, we cannot conclude that the trial court manifestly abused its discretion in determining that termination was in G. B.'s best interest.

2. The mother also argues that the department "did not adequately seek alternatives to termination" by attempting to place G. B. with a family member. OCGA § 15-11-103 (a) (1) provides: "If, upon the entering of an order terminating the parental rights of a parent, there is no parent having parental rights, the court shall first attempt to place the child with a person related to the child by blood or marriage or with a member of the child's extended family." Under the "clear dictates" of this statute, "it is incumbent upon the court and the department to conduct a thorough search for a suitable family member." *In the Interest of J. J. W.*, 247 Ga. App. 804, 807-808 (2) (545 SE2d 21) (2001). The caseworker testified that the department always attempts "to place children with relatives from the beginning, if we have one that we know of that's fit and willing." She stated that the department conducted a "First Placement/Best Placement" evaluation in September 2000, which included "a thorough relative search" and that the department had "knowledge from past dealings with the family." Although the search was conducted approximately two years before the termination hearing, some evidence nevertheless exists showing that the department complied with the dictate of OCGA § 15-11-103 (a) (1), and we therefore find no basis for reversal based on failure to conduct a search for a suitable relative with whom to place G. B. Compare *J. J. W.*, supra, 247 Ga. App. at 807-808 (no search for relative placement ever made).

*Judgment affirmed. Ruffin, P. J., and Miller, J., concur.*

DECIDED OCTOBER 8, 2003.

*Lindsey & Jacobs, Tamara Jacobs*, for appellant.

*Thurbert E. Baker, Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Nina J. Edidin, Assistant Attorneys General, W. Ashley Hawkins*, for appellee.