606 S.E.2d 281 (2004)
270 Ga. App. 194
In the Interest of G.W.R. et al., children.
No. A04A1448.
Court of Appeals of Georgia.
October 27, 2004.
*283 Denise S. Esserman, Rita C. Spalding, Brunswick, for appellant.
Carlton, Gibson & Lawyer, Donald C. Gibson, Brunswick, for appellee.
SMITH, Chief Judge.
The father of G.W.R. and R.P.R. appeals from the juvenile court's order terminating his parental rights. Because the record supports this determination, we affirm.
On appeal from an order terminating an individual's parental rights, we do not determine witness credibility or weigh the evidence. We instead "view the evidence in the light most favorable to the juvenile court's order and determine whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights should have been terminated." (Citation and punctuation omitted.) In the Interest of G.B., 263 Ga.App. 577, 588 S.E.2d 779 (2003). So construed, the evidence presented at the hearing on the petition to terminate the father's parental rights showed that the mother and father of G.W.R. and R.P.R. were previously married but were separated in July 1999 and divorced in October 2001. The mother filed the termination petition in this case in July 2003, when G.W.R. was seven years old and R.P.R. five years old. During the pendency of the divorce proceedings, the father had supervised visitation with the children. Supervision was required because of domestic violence perpetrated by the father against the mother and because the father had, at least once, removed the children from their home and refused to return them for a short period of time.
For approximately two weeks in December 1999, the father was allowed to exercise unsupervised visitation with the children. On December 26, 1999, however, the father stabbed a male friend of the mother outside the mother's residence while the children were inside the home. Although the children did not witness the stabbing, they did observe *284 the victim after he came into the house and was bleeding on the kitchen floor. Since that date, the father has not seen or spoken to the children, as a result of a number of court orders forbidding contact with them. The father was convicted of attempted murder, but the conviction was reversed on appeal, after which the father entered a plea of nolo contendere to the crime of aggravated battery. He was incarcerated from March 2001 until March 2002.
While the divorce was pending, in December 1999, the father was ordered to pay child support. He made five partial payments in 2000, and no payments between September 8, 2000 and February 2003, despite the fact that he has been employed since he was released from prison in March 2002. He began making monthly payments for child support and toward his arrearage only after the State of Florida threatened to revoke or suspend his driver's license for nonpayment of child support.
Before the father was incarcerated, his counsel filed a motion for visitation, which was granted in November 2000. That order actually deferred to the criminal court any decision concerning actual visitation privileges. It appears to be undisputed that the civil court assigned to the divorce case has issued no visitation orders since that time. After the father was released in March 2002, he filed a motion seeking visitation. He subsequently filed a number of motions "requesting hearing time" and a motion to set a final hearing for visitation and abatement of child support. All motions, which were filed by the father without the assistance of counsel, bore the same style and case number of the divorce proceeding and were filed in the Florida county where the divorce was granted. In July 2002, the civil court informed him that he had not properly served the mother with notice of the action and that no further action would be taken until proof of service was received by the court. It appears that the father mailed notice to the mother but did not effect personal service. Again, in November 2002, the civil court informed him that he had to serve the mother personally with any petition that he wished to file. The father did not personally serve the mother with notice of the action to gain visitation.
The mother testified that the children were present during two incidents of domestic violence. She stated that the father had punched several holes in the wall in their home and had threatened to kill both her and the children. The mother testified that the father told her that he would kill the children "first because I needed to sit and watch it and that would kill me." On the occasion discussed above when he absconded with the children, the father called the mother at home at 3:00 a.m. and "was screaming obscenities at me with [G.W.R.] present." She also testified about the stabbing that occurred outside her home, stating that the children witnessed the aftermath of this incident  the victim "collapsing on the floor with the blood and the police and the ambulance." She stated that on the night of the father's arrest, he had "busted all the nails off of" her hand, had thrown her "down on top of my son," and had "drug [R.P.R.] up out of the bed [and] broke the crib." He also took one of the children "to a complete stranger's house and left him."
We note the mother's testimony that after she found a roll of film and had it developed in 2002, she discovered photographs, which she believed to have been taken in early 1999, depicting close up pictures of R.P.R.'s rectum. These graphic photographs were admitted into evidence. The father testified that a police officer investigating sexual abuse allegations had taken the pictures, using the father's camera. He could not explain why the police officer had not used his own camera, and when asked why he did not develop the film, he explained that the film "obviously got lost in me moving out.... I wasn't able to take anything with me at that time but clothes." He testified that the police officer did not follow up on the investigation after the pictures were taken.
A former co-worker of the father testified concerning conversations he had with the father before the divorce, stating that on several occasions the father had talked about slitting the mother's throat and that he had stated that her body would be found at the bottom of a lake. The father similarly stated *285 to this witness that he would do the same thing to the children's maternal grandmother.
Three expert witnesses testified concerning the emotional health of the children. Bonni Martin, a psychotherapist, treated G.W.R. from August 1999, when he was three years old, until May 2001. She testified that she began treating G.W.R. because he had been experiencing problems with bedwetting and aggressiveness and had witnessed domestic violence in his home. She initially diagnosed him as having post-traumatic stress disorder and subsequently determined that this condition was caused by "the exposure to domestic violence and to trauma." She stated that G.W.R. "would feel very fearful of his father, not see him as being protective in any way but love him at the same time." He told Martin "that he saw Daddy fighting with Mommy" and that "Daddy did bad things." When asked to do so by Martin, the mother participated in the therapy sessions. Although the father attended a supervised visitation session, he refused to attend a therapy session requested by Martin. In Martin's opinion, G.W.R. never developed a strong bond with his father.
Martin treated R.P.R. from January 2001 through May 2001, beginning when he was three-and-a-half years old. The treatment began because he was "having difficulty with high attention seeking behaviors, being oppositional, having a poor attention span, [and] being easily distracted and unusually emotional." She similarly diagnosed him as having post-traumatic stress disorder. R.P.R. was also treated by child psychiatrist Kim Masters for four days, when he was hospitalized for his aggressive and self-destructive behavior. She testified that while the child was in the hospital, "he didn't show much of any behaviors except in the context of a family session where he got agitated, he said, as a result of his brother being involved in the session." The history she received from the mother and her new husband, however, indicated that R.P.R. had wrapped a seat belt "around his neck as a suicide attempt." Martin testified that R.P.R. told her that this was not a suicide attempt. The history also indicated that R.P.R. had tried to swallow an electrical cord on a compact disc player, which R.P.R. denied to Martin, and that R.P.R. had "tried to take a golf club to his brother," which R.P.R. "minimized" according to Martin. Also according to the history, R.P.R. had hit his mother and had "witnessed abuse of the mother by his father." R.P.R. stated to Martin that he had no memory of seeing such abuse.
Sue Ann Brewer, the psychologist treating R.P.R. at the time of the hearing, testified that when she first began treating R.P.R. in April 2003, he had "an extremely high activity level. He can't stay focused, he can't attend ... I guess one could basically describe him as climbing the walls in my office." She stated that after conducting ten therapy sessions with R.P.R., his behavior had improved but that "[h]e can be happy go lucky one minute and for no apparent reason will turn around and become extremely hostile and aggressive." Brewer testified that she talked with him "about how he beats [G.W.R.] up." According to Brewer, R.P.R. loves his mother and stepfather "very much." She testified that allowing R.P.R. to see his father "would be detrimental" because R.P.R. "is already very emotionally fragile. It's confusing to him. This is someone he does not know ... and one of the big concerns that I've had with [R.P.R.] is because of his hostility he can hurt somebody.... He gets so out of control, the rage is so great in him that he no longer can stop himself." She believed that contact with the father would exacerbate this aggressive behavior and that bringing a new person into his life would be a change "for the worse."
The children's stepfather testified that he had been financially supporting the two children since his marriage to the mother nearly two years before the hearing and that if the mother's petition were granted, he planned to adopt them. The guardian ad litem recommended that the father's parental rights be terminated.
OCGA § 15-11-94(a) establishes a two-step process for determining whether grounds exist for termination of parental rights. The court must first determine whether parental misconduct or inability exists, which requires clear and convincing evidence *286 that the child is deprived, that the lack of proper parental care or control is the cause of the deprivation, that the cause of deprivation is likely to continue or will not likely be remedied, and that the continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94(b)(4)(A)(i)-(iv). Under OCGA § 15-11-94(b)(4)(B)(iii)-(v), in considering whether the child is without proper parental control and care, the court must consider, among other things,
[c]onviction of the parent of a felony and imprisonment therefor which has a demonstrable negative effect on the quality of the parent-child relationship; [e]gregious conduct or evidence of past egregious conduct of the parent toward the child ... of a physically, emotional, or sexually cruel or abusive nature; [and] [p]hysical, mental, or emotional neglect of the child or evidence of past physical, mental, or emotional neglect of the child ... by the parent.
If clear and convincing evidence of parental misconduct or inability exists, the court must determine whether termination is in the best interest of the child, after considering the child's mental, emotional, moral, and physical condition, including the child's need for a stable home. OCGA § 15-11-94(a). When the child is in one parent's custody, the court must also consider, among other things, whether the noncustodial parent, without justifiable cause, has failed significantly for a period of a year or more before the filing of the termination petition to develop and maintain a supportive, meaningful bond with the child and to financially support the child. OCGA § 15-11-94(b)(4)(C)(i)-(ii).
1. The father argues that the evidence was not clear and convincing that the cause of the children's deprivation was likely to continue or would not be remedied. Of course, as contended by the father, "past deprivation is not sufficient for termination in the absence of clear and convincing evidence of present deprivation." See In the Interest of A.A., 252 Ga.App. 167, 171, 555 S.E.2d 827 (2001). Some evidence of present deprivation was presented. The record shows that the father's support payments before his incarceration were sporadic. After he was released from prison and became gainfully employed, he waited several months to begin making child support payments, doing so only after being threatened with a driver's license suspension. As discussed above, at the time of the termination hearing, he had an arrearage of more than $14,000. And although the father apparently attempted to initiate legal proceedings that would allow him to visit the children, he failed to properly notify the mother of those proceedings despite the direction given him by the appropriate civil court. As we stated in In the Interest of S.H., 251 Ga.App. 555, 558, 553 S.E.2d 849 (2001), any such effort was "too little too late." Id. at 558, 553 S.E.2d 849.
When evidence of present deprivation exists, a parent's past conduct can be considered by the court in determining whether the deprivation is likely to continue. See In the Interest of R.A.R., 259 Ga.App. 680, 685-686(2), 577 S.E.2d 872 (2003). As discussed above, in addition to threatening the lives of the mother and his children, the father was convicted of aggravated assault. Also, although a number of crimes occurred before his marriage to the mother, he had a fairly extensive criminal history. He was previously convicted of giving false information to a peace officer, disorderly conduct, assault, simple assault, DUI, and aggravated battery. He was convicted of domestic violence in April 2001. We note that the father was a school teacher at the time of his 1999 arrest and had failed to list these criminal convictions on his application for a teaching position. The father's immediate past failure to support his children, his failure to go through proper legal channels to seek visitation rights, and his past history of crime and violence constituted evidence from which the juvenile court was authorized to conclude that the children's deprivation was likely to continue.
2. The father argues that the court erred in finding that he failed to develop and maintain a meaningful parental bond, contending that the mother refused to allow "any contact with the children for the preceding four (4) years and sought his incarceration for any attempted contact with her or the children." He points to evidence that he *287 was enjoined by the criminal court from having contact with the children since December 26, 1999 through and including the date of the termination hearing and that the mother "actively sought to keep the no contact provision in place to prevent [him] from any contact whatsoever." He also contends that the record is "replete" with his "numerous but unsuccessful attempts to lift the `no contact' provision and to have visitation with his children." For these reasons, he maintains that his failure to contact his children was not without "justifiable cause."
"Justifiable cause" for failing to pay child support can be found in circumstances "where the parent has been unable to earn income due to incarceration." (Citations omitted.) Bateman v. Futch, 232 Ga.App. 271, 272(1), 501 S.E.2d 615 (1998). But even before he was incarcerated, the father did not fully comply with his child support obligations, and after he was released, as pointed out by the mother, "[o]ther than pure conjecture and speculation, appellant can point to nothing in the record showing appellee had anything to do with continued no contact orders other than reporting appellant's violations to the proper authorities, and there is no evidence appellee did anything other than that to keep appellant from the children." In addition, as argued by the mother, after the father was released from prison, he "failed to conform to the most simple civil procedure, that of proper service on [her] of his purported attempt to gain visitation with the children. [He] admitted he could read and that he understood his attempts to serve [the mother] were incorrect even after the court system notified him twice and gave him information as to who to call to get proper service." Finally, for several months after his release the father "ignored his obligation to pay court-ordered child support. Even if [the mother] did attempt to frustrate his visitation, [the father] was not `justified' in engaging in self-help by refusing to pay the support and should have expected negative consequences for his wilful and intentional acts. [Cit.]" Id. at 274(1), 501 S.E.2d 615.
3. The father contends that the court erred in finding that he failed to provide care and support for the children under OCGA § 15-11-94(b)(4)(C)(ii), arguing that he "made consistent, timely, court-ordered child support payments for the benefit of the children" for five months before the mother filed the petition to terminate parental rights. But as discussed above, he made sporadic payments before his incarceration, and after his incarceration, he failed to support the children for more than a year and began doing so only after the State of Florida threatened to revoke his driver's license for nonpayment of support. The father's failure to pay support as ordered by the trial court was but one of several factors on which the court based its decision to terminate his parental rights, and we find no basis for reversal on this ground.
4. The father argues that the evidence presented at the hearing did not show that continued deprivation would cause serious mental, emotional, physical, or emotional harm to the children, as described in OCGA § 15-11-94(b)(4)(A)(iv). The same circumstances that authorize a juvenile court's conclusion that a child is deprived due to parental inability or lack of proper parental control, and that the deprivation is likely to continue, can provide support for the determination that deprivation will or is likely to cause serious emotional, mental, moral, or physical harm to the child. In the Interest of K.W., 262 Ga.App. 744, 748(1), 586 S.E.2d 423 (2003).
This case is distinguished from In the Interest of K.J., 226 Ga.App. 303, 307-308(2)(b), 486 S.E.2d 899 (1997), cited by the father. In that case, the juvenile court's order failed to state any facts supporting the court's conclusion that continued deprivation would cause serious harm to the child. The court here did include in its order facts from which it concluded that continued deprivation would cause serious harm to the children. The court stated as follows:
Due to [the father's] willful, voluntary, intentional and significant arrearage in child support payments ..., [the father's] felony conviction and incarceration for the same, [the father's] extensive criminal history of convictions, and [the father's] lack of significant contact and total lack of visitation with the children, the Court finds such *288 deprivation is likely to continue and will likely cause serious physical, mental or emotional harm to the children.
Expert testimony established that contact with the father would be harmful to G.W.R. and R.P.R. One expert testified that R.P.R. was "very emotionally fragile" and that it would be detrimental for him to have contact with the father. In addition to this testimony, the father's history of violence, in addition to his failure to establish and maintain a strong parental bond with both children and to support them as required by court order, constituted evidence from which the court could find that termination of parental rights was necessary to prevent serious harm to the children. As stated in the guardian ad litem's written recommendation, "[w]hile no judicial determination is more drastic than the permanent severing of the parent-child relationship, it would be even more drastic to allow [the father] to reenter the lives of these children, who are now living in a safe home environment, and to reassert a destructive and deleterious effect upon their lives." The record contains clear and convincing evidence to support the juvenile court's conclusions, and we find no basis for reversal.
Judgment affirmed.
JOHNSON, P.J., and PHIPPS, J., concur.