**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 29, 2013**

# In the Court of Appeals of Georgia

A12A2088. In the Interest of J. J. S., a child.

PHIPPS, Presiding Judge.

A juvenile court terminated a mother's parental rights with respect to her child, J. J. S., who was 12 years old at the time of the termination hearing. We granted the mother's application for discretionary review. The mother contends that the juvenile court erred in terminating her parental rights because, concerning whether continued deprivation would cause or would be likely to cause serious physical, mental, emotional, or moral harm to J. J. S., the evidence was insufficient. We agree and reverse.

> On appeal from an order terminating an individual's parental rights, we do not determine witness credibility or weigh the evidence. We instead view the evidence in the light most favorable to the juvenile court's order and determine whether a rational trier of fact could have found by

clear and convincing evidence that the natural parent's rights should have been terminated.[1]

So viewed, the evidence showed that in January 2009, the mother was arrested for alleged acts of misconduct toward her children, including J. J. S. and two siblings. All of the children were placed in protective custody. On October 13, 2009, the court entered an order which stated, among other things, that the Georgia Department of Human Resources Division of Family and Children Services (DFCS) had filed a motion to return custody of the children back to the mother, and that the court was terminating its jurisdiction and returning the children, including J. J. S., back to the mother, who, the court found, had substantially completed a case plan designed to reunite her with her children.

In February 2010, police received a report of genital mutilation, indicating that a part of the sexual organ of the mother's youngest child (not J. J. S.) had been removed, and they arrested the mother on March 10, 2010.[2] DFCS again took custody of the children, and implemented a reunification case plan. The mother remained

---

[1] *In the Interest of G. W. R.*, 270 Ga. App. 194 (606 SE2d 281) (2004) (citation and punctuation omitted).

[2] The mother, at the time of this arrest, was not incarcerated based on allegations from the January 2009 arrest.

incarcerated after the March 2010 arrest. And on May 3, 2011, the state indicted the mother for 24 counts of cruelty to children for various acts allegedly committed against her children; the indicted charges were related to the January 2009 arrest. On June 6, 2011, the mother entered a plea of guilty pursuant to *North Carolina v. Alford*,[3] to six of the counts.[4]

Specifically, concerning J. J. S., the mother pleaded guilty to "choking [J. J. S.] and covering [the child]'s mouth with her hand so she couldn't breathe," and to "making [J. J. S.] stand in a corner for an extended period of time with her arms in the air." As to the siblings, the mother pleaded guilty to two counts of scaring them with a mask, making one of them stand in a corner for an extended period of time with his arms in the air, and making another one eat hot peppers. The mother was sentenced to a total of 15 years, with 4 years to be served in confinement and the balance on probation, with credit for time served since March 10, 2010. At some point, the state

---

[3] 400 U. S. 25, 37 (91 SCt 160, 27 LE2d 162) (1970) ("An individual accused of [a] crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.").

[4] A Nolle Prosequi order was entered on the remaining counts.

dismissed against the mother criminal charges in connection with the February 2010 genital mutilation allegations.

On June 17, 2011, DFCS filed a petition to terminate the mother's parental rights to J. J. S. DFCS alleged that it had temporary custody of J. J. S. by virtue of prior unappealed orders of the court, and that J. J. S. was residing at a group home. Particularly, DFCS alleged that

> [J. J. S.] remain[ed] deprived due to the mother's incarceration resulting from her conviction of six counts of Cruelty to Children in the Second Degree and her history of instability, neglect and abuse. The mother has been incarcerated since March 10, 2010, and is sentenced to serve four years, with credit to be given for the time she has already served. Due to this incarceration, the mother has not been able to provide the basic means of support and parental care of this child, and her incarceration has been a negative effect on the relationship between the mother and her daughter.

A hearing on the termination petition held on September 20, 2011 and continued on October 10, 2011, showed the following. J. J. S. and her siblings had, throughout the years, been removed from the mother's care on several occasions and placed in the custody of DFCS. The mother's criminal history included a 2003 guilty plea to a charge of criminal attempt to commit theft by taking, a 2004 entry of a

4

protective order against the mother for stalking, a 2010 guilty plea to a charge of battery, and the 2011 guilty plea to the child cruelty charges. On one occasion, the mother had threatened to harm police officers if they did not leave her property; the officers had approached the mother's home to investigate child medical neglect allegations, that were later found to be unsubstantiated.

The evidence further showed that J. J. S. had significant behavioral issues. After the mother's arrest in March 2010, DFCS had found a relative placement for the mother's other children, but no suitable relative was willing to take custody of J. J. S. The child had been disruptive in several foster homes; she was placed in one therapeutic foster home, and she stole items and set several fires in that home. Her therapist reported that J. J. S. had "[v]erbal aggression towards peers and adults, [and] explosive temper outbursts." At the time of the termination hearing, the child resided in a group home, suited to address her behavioral needs. J. J. S. has consistently informed case workers, therapists, and the juvenile court judge, that she does not want to be adopted and desires to be with her mother. Two therapists testified that, at this point, J. J. S. would likely sabotage any adoption effort. The child's current DFCS case manager testified that currently, discussions about adoption were "on the back burner. We're trying to get her behavior under control." At the time of the termination

5

hearing, no potential adoptive placement had been found, and the experts could not predict when J. J. S. might become adoptable. One of the therapists testified: "Good, bad or indifferent, [J. J. S.] [was] very bonded with her mother."

The mother contends that the juvenile court erred in terminating her parental rights because, concerning whether continued deprivation would cause or would be likely to cause serious physical, mental, emotional, or moral harm to J. J. S., the evidence was insufficient. We agree.

In considering the termination of parental rights, the court shall first determine whether there is present clear and convincing evidence of parental misconduct or inability.[5] If there is, the court shall then consider whether termination of parental rights is in the best interest of the child.[6] The court determines parental misconduct or inability by finding that: (1) the child is a deprived child (defined in OCGA § 15-11-2 to mean a child who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals);[7] (2) the lack of proper parental care

---

[5] OCGA § 15-11-94 (a).

[6] Id.

[7] OCGA § 15-11-94 (b) (4) (A) (i); OCGA § 15-11-2 (8).

6

or control by the parent in question is the cause of the child's status as deprived;[8] (3) such cause of deprivation is likely to continue or will not likely be remedied;[9] and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.[10]

In its order terminating the mother's parental rights, the juvenile court took into consideration J. J. S.'s wishes (to not be adopted, and to be reunited with her mother), and the bond between J. J. S. and the mother. The court made no specific factual findings as to whether the fourth factor listed above had been met, but pertinently ruled as follows:

> In determining the said child[] to be without proper parental care and control the Court considered and the evidence showed clearly and convincingly, that [the mother] has a history of criminal involvement and subsequent arrests and a history of child protective services involvement; that she is presently incarcerated following her best interest plea to cruelty to children; the present incarceration, viewed cumulatively with her criminal history, thereby justifies termination as set out in OCGA § 15-11-94 (b) (4) (A)."

---

[8] OCGA § 15-11-94 (b) (4) (A) (ii).

[9] OCGA § 15-11-94 (b) (4) (A) (iii).

[10] OCGA § 15-11-94 (b) (4) (A) (iv).

This court has held that "[t]he same circumstances that authorize a juvenile court's conclusion that a child is deprived due to parental inability or lack of proper parental control, and that the deprivation is likely to continue, can provide support for the determination that deprivation will or is likely to cause serious physical, mental, emotional, or moral harm to the child."[11] Here, the mother does not challenge the juvenile court's finding that J. J. S. was deprived, that the mother is the cause of J. J. S.'s status as deprived, and that the cause of deprivation is likely to continue or will not likely be remedied. But "the facts must support the finding. In other words, it is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child. Otherwise, the fourth part of the test would have no meaning."[12]

> [A]n order terminating parental rights must contain explicit findings supporting the conclusions that by reason of the deprivation the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm. . . . The trial judge is to ascertain the facts and to state not only the end result of that inquiry but the process by which it was reached. . . . Without . . . specific factual findings on the issue of the

---

[11] *In the Interest of G. W. R.*, supra at 200 (4) (citation omitted).

[12] *In the Interest of J. T. W.*, 270 Ga. App. 26, 37 (2) (d) (606 SE2d 59) (2004) (footnote omitted).

likelihood of serious harm from continued deprivation, we have no basis to evaluate whether the juvenile court properly determined that clear and convincing evidence supported the court's conclusion on that issue.[13]

The court made no finding as to whether J. J. S. was, at the time of the hearing, suffering due to her placement or whether without a permanent placement J. J. S. would suffer serious harm.[14] One therapist opined: "I think at this moment, it would probably be a good idea for [J. J. S.] to stay in a group home and work through some of the behaviors that she has." Moreover, there was no testimony that J. J. S. was likely to suffer serious harm if parental rights were not terminated.[15] There was no testimony regarding the effect on J. J. S. of her mother's incarceration or the likely effects if parental rights were not terminated.[16] Another therapist testified that J. J. S. had handled "fairly well" learning that her mother had been sentenced to four years in prison. None of the witnesses testified that J. J. S.'s relationship with the mother

---

[13] *In the Interest of K. L. M.*, 316 Ga. App. 246, 252-253 (d) (729 SE2d 452) (2012) (citations and punctuation omitted).

[14] See *In the Interest of D. F.*, 251 Ga. App. 859, 862 (555 SE2d 225) (2001).

[15] See id.; *In the Interest of K. J.*, 226 Ga. App. 303, 308 (2) (486 SE2d 899) (1997).

[16] See *In the Interest of K. J.*, supra.

9

was, at the time of the hearing, harmful to J. J. S.[17] The evidence showed that although the mother, at the time of the termination hearing, was incarcerated for committing child cruelty crimes, she had, prior to her incarceration, completed a DFCS case plan regarding those acts of child cruelty, and the juvenile court had returned custody of J. J. S. to the mother.

Here, the mother's incarceration limited her exposure to J. J. S. And the evidence showed, without dispute, that as of the time of the termination hearing, DFCS had not located an adoptive placement for J. J. S., the child was not then adoptable because of behavioral problems, and the experts could not predict when J. J. S. might become adoptable. In other words, there was no evidence that terminating the mother's parental rights would affect her current placement.[18] And although the juvenile court found that "sometimes termination of parental rights can bring closure and help the child move toward being more open to adoption," it noted that J. J. S.'s therapist "did not have an opinion regarding that scenario in this case."

"[T]here is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized

---

[17] See id.; *In the Interest of D. F.*, supra.

[18] See generally *In the Interest of D. F.*, supra.

10

deliberately and exercised most cautiously. . . . Accordingly, compelling facts are required to terminate parental rights."[19] "[Here], we cannot say that the evidence authorized the trial court to find by clear and convincing evidence that [J. J. S.] was likely to suffer serious physical, mental, moral or emotional harm. Therefore, the order terminating the [mother]'s parental rights must be reversed."[20]

*Judgment reversed. Dillard, J., concurs. Ellington, C. J., concurring in judgment only.*

---

[19] *In the Interest of K. J.*, supra at 306 (1) (citation and punctuation omitted).

[20] Id. at 309 (2) (b); see *In the Interest of J. M.*, 251 Ga. App. 380, 383 (4) (554 SE2d 533) (2001); *In the Interest of D. F.*, supra.