577 S.E.2d 872 (2003)
259 Ga. App. 680
In the Interest of R.A.R. et al., children.
No. A02A1944.
Court of Appeals of Georgia.
February 14, 2003.
*873 Orin L. Alexis, Savannah, for appellant.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Asst. Atty. Gen., Leo G. Beckmann, Jr., Savannah, for appellee.
SMITH, Chief Judge.
The mother of R.A.R., A.U.R., and N.R.R. appeals from the order issued by the juvenile court terminating her parental rights, arguing that insufficient evidence of parental misconduct was introduced. The standard of appellate review in termination cases "is whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody were lost." (Citation and punctuation omitted.) In the Interest of J.R., 202 Ga.App. 418-419, 414 S.E.2d 540 (1992). After reviewing the evidence under this standard, we conclude that the juvenile court was authorized to terminate the mother's parental rights, and we affirm.
Appellant is the 28-year-old mother of seven children.[1] In April 1999, six of the children were placed in the custody of Chatham County Department of Family and Children Services (DFACS), and by consent of the mother, the juvenile court issued an order finding them deprived in July 1999. The juvenile court found in the order that the children had been in the care of DFACS since April 1999 due to "issues of neglect regarding the children's physical, mental, emotional and education needs." One child had been diagnosed with sickle cell anemia, and all the children needed to be screened for the disease. The court found that none of the children had ever seen a dentist and that "[i]n addition to lack of medical care, the children's schooling is a big issue in that all children presently attending public schools have failed the 1998-1999 school year due to excessive absences." The order went on to recite that DFACS had "made more than reasonable efforts to provide various services to [the mother] in order to avoid having to intervene in the family but [the mother] will not use the services that are available and have been offered to her." A short time after entry of this order, the mother was incarcerated, and in December 1999, she gave birth to a seventh child who was immediately *874 placed in the custody of DFACS and found to be deprived. These orders were not appealed.
DFACS developed a reunification case plan for the mother in which she was to meet several requirements, including the following: remain drug and alcohol free and submit to periodic screens; visit with the children each week; provide a stable residence; complete parenting classes or group therapy; submit to a psychological evaluation and follow the recommendations resulting from the evaluation; pay child support of $5 per child per month; and seek and maintain stable employment. After the mother was released from prison, she made some progress toward completion of the reunification plan. DFACS made two attempts to return the children to the mother, however, which were unsuccessful because the mother lost her housing and could not provide adequate day care. The mother was then arrested for a probation violation, and DFACS filed a petition for termination of the mother's and putative fathers' rights in R.A.R., A.U.R., and N.R.R.[2]
Brenda Spencer, the family's caseworker, testified during the termination hearing that although the mother complied with some portions of the reunification plan, she did not fully comply with all of her case plan requirements. She underwent a psychological evaluation and attended parenting classes, but Spencer saw no improvement in her parenting skills following these classes. The mother also obtained employment but was laid off because of a disciplinary action. At one time, she told Spencer she was employed but in fact was not. The mother missed some appointments for drug screens, and although the last screen to which she submitted was negative, she tested positive for marijuana during at least one other screen. In addition, she did not obtain suitable housing, as her last two residences lacked adequate furnishings, appliances, and utilities. Furthermore, at the time of the hearing she was living with a man with an "extensive criminal history."
Spencer also testified during the April 16 hearing that since the mother's most recent release from prison in early April, the mother had not contacted her or anyone from DFACS, nor had she contacted the children. And although the mother did not report to prison until November 7, 2001, with regard to her probation violation, the mother's last supervised visit with the children was September 22, 2001. The mother provided no financial support for the children and sent no gifts or letters to them. At the time of the hearing, Spencer did not know where the mother was living. Spencer testified that R.A.R. and A.U.R. were in one foster home and that N.R.R. was in another, that they had bonded with their foster families, who wished to adopt them, and that the two families allowed the children to visit one another.
Dr. Frances Hinchey, a clinical psychologist, testified concerning her psychological evaluations of the mother in October 1999 and October 2000. During Dr. Hinchey's 1999 involvement with her, the mother "tended to be rather argumentative and defensive," and she showed "a tendency for a personality disorder with narcissistic and antisocial features." The mother was involved in "[m]ultiple relationships" and had "primarily lived on AFDC monies and food stamps" until she was certified as a nursing assistant. Although Dr. Hinchey found the mother to be more cooperative during the October 2000 evaluation, she nevertheless found her to have "significant limitations relative to her understanding of appropriate parenting roles and presence of empathy, as well as really not experiencing a real connectiveness to her children." Dr. Hinchey further testified that she
was concerned in 1999 that [the mother] did not seem to have a full understanding of her responsibility as a parent and I was rather skeptical and felt that she would need ongoing monitoring in order to adhere to expectations from the Department and appropriate parenting behavior. In the year 2000, I was concerned that she had very limited motivation. She had little knowledge of her children and their development, *875 other than in a cursory fashion, and I believe that the characterological nature of her personality and issues would tend to keep replicating her mistakes across time and I did not think this would bode well for the children's stability.
Dr. Hinchey stated that the mother had problems maintaining employment and stability "even with the children not present." And although the children probably were not in danger "by acts of aggression," Dr. Hinchey was concerned about "issues of neglect because of the self-focus and difficulty following through with responsibility, because it does not occur to her," and Dr. Hinchey testified that the mother "described herself... and the reasons for the past acts of neglect as because she's been lazy." Dr. Hinchey stated that the disorder with which she had diagnosed the mother was "very difficult to change, and so [the mother's] behavior is likely to still show marginal adjustment and self-centeredness, which, if a person is not recognizing that the self-centeredness is an issue, it's going to be difficult to change that."
Dr. Deborah Seng, also a clinical psychologist, evaluated the children in June 2001 and found them to be "very bright, emotionally normal children." She testified that the older two children had been in foster care most of their lives and that the youngest child had been in foster care since birth. Dr. Seng stated that all three children had bonded with their foster families. She stated that "[t]he two little girls, I don't think, had any kind of memory or idea about [their] mother. The foster mother was the only mother they really knew." When Dr. Seng asked the third child "to draw his family, he drew his foster family, and he called his foster mother Mama, so that's who he identified as mother." She testified that no natural relative had bonded with the children. As for the mother, Dr. Seng stated that two of the children "don't know their mother, so they do not have an attachment. Nothing has been formed." She believed that removal of the children from their foster homes "would create great difficulty" for them and that "it would likely be in their best interest to remain where they are currently attached."
The court-appointed special advocate, Phyllis Evans, testified concerning her observations of the children. With regard to the youngest child, two years old at the time of the hearing and who had been in foster care all of her life, this witness testified that the child "sits closely up under [her foster mother] and she hugs her legs. Not a lot of verbal conversation between us, but I just observe and see how she responds to the foster mom, so I see there's a bond there." As for the other two children, who lived with another foster family, Evans testified that the girl "smiles a lot and says she want to be here with Mommy," her foster mother. And although the boy told her he "misses his mom and he wants to go there and live with her ... he also wants to come back and be able to spend nights and weekends with [his foster mother]. He has a bond with her. He doesn't want to break that." She believed that it was in the children's best interests "to be adopted and have permanency in their lives."
The mother testified that following her release from prison, she had contacted an agency about finding a home health job, but she could not remember the name of the agency. When asked why she had not contacted her children following her release from prison, she testified that she did not know the address at which her oldest three children were residing, and she gave no other reason why she had not contacted the other four children.
The decision to terminate parental rights involves a two-step process under OCGA § 15-11-94(a). The juvenile court must first determine whether there is present clear and convincing evidence of parental misconduct or inability, as defined in OCGA § 15-11-94(b)(4). Parental misconduct exists when the child is deprived, the lack of proper parental care or control is the cause of the deprivation, the cause of deprivation is likely to continue or is not likely to be remedied, and continued deprivation is likely to cause serious harm to the child. OCGA § 15-11-94(b)(4)(A)(i)-(iv). Parental unfitness cannot be based on past unfitness alone but "must be based on present circumstances." (Punctuation and footnote omitted.) *876 In the Interest of L.J.L., 247 Ga.App. 477, 480, 543 S.E.2d 818 (2001). If the court finds clear and convincing evidence of misconduct or inability, the court must then determine whether termination is in the child's best interest after considering the child's physical, mental, emotional, and moral condition and needs, including the child's need for a stable and secure home. OCGA § 15-11-94(a).
1. The children's deprivation was established by orders of the juvenile court, which were not appealed. The mother is therefore bound by the findings in those orders. See In the Interest of D.M.H., 242 Ga.App. 47, 48(1), 528 S.E.2d 816 (2000). And there is no question but that the mother's lack of parental care and control is the cause of the deprivation. Evidence was presented that the mother suffered from a psychological disorder that affected her ability to provide adequate care for the children. In addition, at times she tested positive for marijuana, and she was convicted of theft by conversion and later arrested and incarcerated on a probation violation. While she was incarcerated, she made no attempt to contact the children. Furthermore, the mother failed to provide adequate housing and medical care for the children, and the children who were in school failed because of excessive absences. These factors all bore upon the trial court's determination as to whether the children were without proper parental care and control under OCGA § 15-11-94(b)(4)(B)(i)-(iv).
Also, because the children were not in the mother's custody, the trial court was required to consider whether the mother,
without justifiable cause, [had] failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: (i) [t]o develop and maintain a parental bond with the [children] in a meaningful, supportive manner; (ii) [t]o provide for the care and support of the [children] as required by law or judicial decree; and (iii) [t]o comply with a court ordered plan designed to reunite the [children] with the parent or parents.
OCGA § 15-11-94(b)(4)(C)(i)-(iii).
The termination petition was filed November 28, 2001. For more than a year before that time, the mother provided no financial support for the children, and she did not complete her reunification plan. The mother could not provide adequate housing for the children, and she failed to communicate with them by telephone or letter while she was incarcerated. After her release, she did not communicate with them or DFACS. The mother failed "[t]o develop and maintain a parental bond with the [children] in a meaningful and supportive manner," OCGA § 15-11-94(b)(4)(C)(i), and both past and present unfitness were shown, supporting the juvenile court's decision that the mother failed to exercise proper parental care and control of the children. See In the Interest of D.M.H., supra at 49(1), 528 S.E.2d 816; In the Interest of D.W.A., 253 Ga.App. 346, 348, 559 S.E.2d 100 (2002).
2. The record also supports the finding that the children's deprivation is likely to continue. "In addition to evidence of present parental misconduct or inability, evidence of past conduct may be considered in determining whether the deprivation would be likely to continue." (Citation and punctuation omitted.) In the Interest of M.L.P., 236 Ga.App. 504, 509(1)(c), 512 S.E.2d 652 (1999). Despite numerous attempts by DFACS to assist the mother in learning to care for her children, the mother failed to obtain adequate housing for the children, to obtain employment, to remain drug free, and to financially support the children throughout the tenure of the children's custody with the department. Although she was released from prison only a short time before the termination hearing, she made minimal efforts to search for employment, and as discussed above, she had no communication with the children during and after her incarceration. Her behavior, which continued until the day of the hearing, reflected her unwillingness to change and to begin caring for the children in an appropriate manner. Although the mother testified that she had learned from her mistakes and that she loved and wanted to care for the children, "[t]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." (Citation and *877 punctuation omitted.) In the Interest of R.N., 224 Ga.App. 202, 205(2), 480 S.E.2d 243 (1997).
3. The juvenile court's conclusion that the children's continued deprivation is likely to cause harm to the children also is supported by the record. At the time two of the children were removed from her custody, the mother had failed to provide adequate medical care for them, in addition to having other "antisocial features" in her profile. Dr. Hinchey testified that such psychological problems would continue if left untreated and that the mother was not motivated to obtain psychological assistance. Also, as discussed above, two attempts at reunification failed because the mother did not obtain adequate housing. Once, she was evicted from public housing, and on another occasion she did not provide beds for the children. Also, her dwelling had no gas. The mother had a criminal record and failed to attend and pass all of her drug screens. In addition, at the time of the hearing she admittedly was living with her boyfriend, who had an "extensive criminal history." These facts support a finding that continued deprivation would cause serious physical, mental, or moral harm to the children. See In the Interest of D.T., 251 Ga.App. 839, 846, 555 S.E.2d 215 (2001) (among other things, criminal history of mother and father, substance abuse, and "prolonged lack of interest in being a parent" sufficient to show that continued deprivation would cause harm).
Furthermore,
[t]he juvenile court was authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children. Indeed, children need permanence of home and emotional stability or they are likely to suffer serious emotional problems. A caseworker's testimony about the need for permanency may be considered.
(Punctuation and footnotes omitted.) In the Interest of M.C.L., 251 Ga.App. 132, 136(1), 553 S.E.2d 647 (2001). At the time of the hearing, all three children had been in foster care for more than two years, one since birth. Two of the children had no bond whatsoever with the mother. And while the third child did know her, he showed a strong bond with his foster family.
The psychologist who evaluated the children testified that she was aware of the policy in this state of trying "to get children back in the home as soon as possible, once they've been removed and placed into foster care," but she added that this occurs when parents have "visited with their children on a regular basis." According to this witness, two of the children "don't know their mother, so they do not have an attachment. Nothing has been formed." She also testified that children returned to a parent after placement in foster care for such an extended period as that involved here face "great difficulty. It would almost be as if they were being sent to a stranger." In addition to evidence concerning the mother's past and present behavior toward and concerning the children, this evidence concerning the effects of returning the children to the mother after prolonged foster care with little to no contact with her authorized a conclusion that the children likely would be harmed by continued deprivation. In the Interest of M.C.L., supra. See also In the Interest of D.T.C., 248 Ga.App. 788, 792(2)(d), 548 S.E.2d 11 (2001).
4. Finally, the juvenile court was required to consider whether termination was in the best interests of the children. "[A]s with the `harm' factor set forth above, in determining the best interests of the children, a court may consider their need for a stable home environment and the detrimental effects of prolonged foster care." (Footnote omitted.) In the Interest of M.C.L., supra, 251 Ga.App. at 136(2), 553 S.E.2d 647. In addition to evidence concerning the adverse effects of returning the children to their mother, testimony was presented that the children had bonded with their foster families, who had provided nurturing environments for them and who were prospective adoptive families. Furthermore, the same factors showing the mother's inability to care for the children support a finding that termination of her rights would be in the children's best interests. Id. See also In the Interest of D.T.C., supra, 248 Ga.App. at *878 792(3), 548 S.E.2d 11. Clear and convincing evidence was presented that the mother's parental rights in the children were lost, and we therefore affirm the juvenile court's order terminating those rights.
Judgment affirmed.
ELDRIDGE and ELLINGTON, JJ., concur.
NOTES
[1] Three of the children have the same father. Two have another father, and the remaining two children have different fathers.
[2] At the time of the hearing, the other children were in DFACS custody and had been placed with two separate paternal grandmothers.