**FIFTH DIVISION
PHIPPS, P. J.,
DILLARD and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**October 20, 2016**

# In the Court of Appeals of Georgia

A16A1295. IN THE INTEREST OF D. M. AND B. A. M., children.

DILLARD, Judge.

The mother of D. M. and B. A. M., two minor boys, appeals from the juvenile court's order terminating her parental rights.[1] She argues that the juvenile court erred by terminating her rights when the evidence was insufficient to support the court's decision. Because the evidence was sufficient as to some factors but the juvenile court failed to make the requisite findings of fact as to others, we vacate and remand for additional proceedings consistent with this opinion.

On appeal, we view the evidence in the light most favorable to the juvenile court's disposition to determine whether any rational trier of fact could have found

---

[1] The juvenile court also terminated the rights of the boys' father, but he is not a party to this appeal.

by *clear and convincing evidence* that the mother's parental rights should have been terminated.[2] But as we have repeatedly emphasized, this deferential standard of review is tempered by the fact that

> there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.[3]

So viewed, the record reflects that D. M. (born August 3, 2009) and B. A. M. (born January 4, 2011) were first removed from their mother's home in February 2011, after reports of domestic violence, unsanitary living conditions, the threat of

---

[2] *In the Interest of J. A. B.*, 336 Ga. App. 367, 368 (785 SE2d 43) (2016).

[3] *Id.* (punctuation omitted); *see also In the Interest of S. O. C.*, 332 Ga. App. 738, 743 (774 SE2d 785) (2015); *In the Interest of C. J. V.*, 323 Ga. App. 283, 283 (746 SE2d 783) (2013); *In the Interest of M. A.*, 280 Ga. App. 854, 856 (635 SE2d 223) (2006); *In the Interest of T. E. T.*, 282 Ga. App. 269, 269-70 (638 SE2d 412) (2006); *In the Interest T. J. J.*, 258 Ga. App. 312, 314 (574 SE2d 387) (2002). With this in mind, we note that the mother's brief fails to comply with the rules of this Court, which require an appellant's brief to contain "argument and citation of authorities." Court of Appeals Rule 25 (a) (3); *see also* Court of Appeals 25 (c) (2) ("Any enumeration of error which is not supported in the brief by citation of authority or argument may be deemed abandoned."). Our review of this appeal was hindered by the appellant's failure to cite to a single legal authority beyond the new provision in the Juvenile Code.

2

imminent eviction, and the mother's refusal to stay in a shelter to protect the children from their father. In April 2011, after a hearing, the juvenile court found by clear and convincing evidence that the children were deprived and placed them in the temporary custody of the Department of Family and Children Services ("the Department").

In July 2011, the juvenile court approved of a case plan for the boys' parents, which required the parents to, *inter alia*, complete parenting classes, obtain and maintain a source of income and housing, obtain childcare and assure that the children were properly supervised, complete a domestic-violence assessment, and complete and follow recommendations after a psychological evaluation. Then, in March 2012, the Department moved for an extension of the previous deprivation order so that it could monitor the mother's progress with the case plan until she moved into a new home, though she had completed some aspects of the plan.[4]

On April 27, 2012, *nunc pro tunc* March 28, 2012, the juvenile court entered an order returning custody of the children to the mother subject to an aftercare plan. However, on April 24, 2012, the court entered a second shelter-care order that once again placed the children in the Department's custody following a report by law

---

[4] D. M. and B. A. M.'s father consented to non-reunification with the children.

enforcement that then one-year-old B. A. M. had nearly been run over while playing in the middle of the street and while then two-year-old D. M. was playing by the edge of the road (both of the toddlers had been playing outside without any supervision by their mother). In addition to this troubling report, the Department discovered that upon the children's return to the mother, she had failed to use either the approved child-care services arranged by the Department or the Department-approved backup child-care services offered by a friend. Instead, the mother left the children in the care of a person who had a criminal drug history and an "extensive" history with the Department. Furthermore, two Department representatives observed that the children were very dirty while in the mother's care, that the upkeep of her home had suffered a drastic decline, and that she was once again facing eviction.

The same day that the children returned to the Department's custody, the juvenile court approved of a second case plan for the mother, which required the mother to submit to another psychological evaluation and develop a stronger support system, in addition to goals that were identified in the previous case plan. Then, on June 7, 2012, *nunc pro tunc* May 16, 2012, the court found by clear and convincing evidence that the children were deprived.

4

The children were again returned to the mother in March 2013, and their return was subject to her completion of an aftercare case plan. While working on the goals of the aftercare plan, in August 2013, the Department received an unsubstantiated report that then two-year-old B. A. M. had a visible hand-print-shaped bruise on his face. D. M., who was then four years old, was interviewed and reported that the mother's boyfriend had hit the child and called him a "lying baby" and his mother a "stupid bitch." The Department eventually closed the case against the mother, however, due to her progress with the aftercare case plan.

But then, in December 2013, the Department received substantiated reports that D. M. had significant bruising on his bottom and back and a cut on his arm. D. M. reported that his mother had cut his arm with a knife and hit him, which he said she did when she was angry. When the Department spoke to the mother about these allegations,[5] she responded that the cut to D. M.'s arm was caused by a chain link fence but admitted that the bruises were probably from a spanking she administered with a belt. Around this same time, the mother was also referred to a therapist for

[5] The Department representative met with the mother while the mother was at D. M.'s school, and the representative noticed that while the mother was inside, she left B. A. M. and another unidentified small child unattended in her car with the engine running.

assistance in dealing with what was deemed problematic behavior by D. M., but the mother did not believe that D. M. needed services and instead minimized his behavior.

Finally, in April 2014, the Department received a report that D. M. had a burn mark on his foot, and that he had again been found in the middle of the road. And then, in May 2014, the Department received a report that a neighbor saw still four-year-old D. M. outside after dark, knocking repeatedly in an attempt to enter the residence, and that the mother appeared unconcerned when she eventually opened the door. The same neighbor also reported seeing D. M. nearly get hit by a car while in the road. Thereafter, when the Department presented her with a safety plan that required her agreement to properly supervise the children and keep them out of the road, the mother refused to sign it.

Ultimately, in July 2014, following a hearing on a dependency petition, the juvenile court found by clear and convincing evidence that the children were dependent and placed them in the Department's custody for a third time. And in February 2015, the Department filed its petition seeking to terminate the mother's parental rights, upon which a hearing was conducted in July 2015.

At the hearing on the petition to terminate, Department representatives and other witnesses recounted many of the facts set forth *supra* and, additionally, there was testimony that the mother cooperated with the Department when actively working on case plans but would immediately become uncooperative after the children were returned to her custody. One Department representative opined that the mother behaved appropriately toward her children in a controlled environment but quickly regressed without supervision, and that the allegations against the mother grew more serious with each removal from her care. As a result, the Department determined that it would no longer seek reunification between the mother and children.

The boys' foster parents also testified at the hearing and expressed their desire to adopt the children. They recounted the struggles they encountered when the boys first came to live in their home a little over one year prior to the hearing—particularly angry, defiant behavior by D. M., who was prone to hoarding, lying, nightmares, bed wetting, and daytime accidents. But both children's behavior had significantly improved since beginning therapy. The foster parents also testified that they had stopped informing the children about impending visits with their mother until they were en route because there was a noticeable increase in defiant and regressive behavior before and after these visits, with D. M. the one to primarily exhibit this

behavior, which B. A. M. would then mimic. Additionally, the foster father testified that the boys no longer referred to their mother as "mom," but instead by her first name.

In addition to the foregoing, the juvenile court also considered deposition testimony from a licensed psychologist who conducted three separate evaluations of the mother in April 2011, June 2012, and September 2014. In April 2011, she diagnosed the mother with postpartum depression and deferred a diagnosis of personality disorder. The psychologist also noted that the mother seemed to be attracted to abusive, possessive men who abused substances, and she believed the mother's low self-esteem was manifested by continuously making poor decisions. Finally, the psychologist noted that while the mother was motivated to regain custody of the children, she was also at a high risk for abusive parenting due to inappropriate expectations of children (*i.e.*, the mother believed the children could care for themselves without supervision) and lacked the ability to be empathetic.

During the second evaluation in June 2012, the psychologist no longer believed the mother suffered from postpartum depression, but again observed that she displayed traits of dependent and avoidant-personality disorder. She also noted that the mother trusted others too quickly, was prone to procrastination, had not made

progress on recommendations from the April 2011 report, was defensive about the possibility of suffering from psychological problems, and was extremely sensitive to criticism.

Finally, during the September 2014 evaluation, the mother denied having any problems, which suggested to the psychologist that she had not benefitted from the many services provided by the Department and was not making progress. And this time, the psychologist also confirmed that the mother was suffering from a personality disorder. According to the doctor, the mother's personality disorder impaired her functioning and resulted in rigidity to change, which explained the mother's inability to make lasting change and her immediate relapses to past behaviors. Thus, the psychologist concluded that providing the mother with additional services would not improve her prognosis because she had already been provided with these services without any improvement. The psychologist ultimately recommended against returning the children to the mother's custody unless another individual could be present in the home and assume primary responsibility for parenting the children, and thus, she recommended the termination of the mother's parental rights.

After considering all of the foregoing, the juvenile court terminated the mother's parental rights on October 22, 2015. This Court thereafter granted the mother's application for discretionary appeal.

At the outset, we note that the new Juvenile Code applies in this case because the State's petition to terminate parental rights was filed in February 2015.[6] And like the former Juvenile Code, Georgia's new Juvenile Code provides for a two-step process to determine whether terminating parental rights is warranted in a particular case.[7]

First, as outlined in OCGA § 15-11-310 (a), the juvenile court must find that one of five statutory grounds for termination has been satisfied. And here, the statutory ground at issue is OCGA § 15-11-310 (a) (5), which provides that

> [a] child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and

---

[6] *See* Ga. L. 2013, p. 294, § 5-1 ("This Act shall become effective on January 1, 2014, and shall apply to all offenses which occur and juvenile proceedings commenced on and after such date.").

[7] *Compare* OCGA § 15-11-310 *with* OCGA § 15-11-94 (2013).

the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.

Then, if the foregoing statutory grounds for termination have been met, the juvenile court must determine whether termination is in the child's best interests after considering several specified factors.[8] Of course, in all termination proceedings, "the standard of proof to be adduced to terminate parental rights shall be by clear and convincing evidence."[9]

Importantly, our analysis is guided by an overarching constitutionally based principle that the termination of parental rights is a "remedy of last resort which can be sustained only when there is clear and convincing evidence that the cause of the deprivation is likely to continue."[10] Indeed, as our Supreme Court has emphasized, "[o]ne who is subject to the termination of parental rights cannot be equated to an individual who faces an interruption of custody" because termination "is a much more

---

[8] *See* OCGA § 15-11-310 (b) (1)-(4).

[9] OCGA § 15-11-303.

[10] *In the Interest of T. Z. L.*, 325 Ga. App. 84, 91 (1) (a) (751 SE2d 854) (2013) (punctuation omitted); *accord In the Interest of J. V. J.*, 329 Ga. App. 421, 424 (765 SE2d 389) (2014); *In the Interest of C. J. V.*, 323 Ga. App. 283, 287 (746 SE2d 783) (2013).

severe measure" that acts "to address the most exceptional situation of a deprived child and that child's continuing deprivation."[11] Put another way, "it is one thing to remove a child from a parent's custody for reasons of neglect, but quite another to permanently and irrevocably sever the natural parent-child relationship."[12] And there is a reason for this crucial distinction: "Terminating a parent's rights, and thus forever foreclosing the possibility of restoring the natural parent-child relationship, is governmental extinguishment of the parent and child's constitutional right to familial relations."[13] There is, then, no judicial determination which has "more drastic significance than that of permanently severing a natural parent-child relationship."[14]

---

[11] *In the Interest of A. C.*, 285 Ga. 829, 833 (2) (686 SE2d 635) (2009); *see also In the Interest of S. O. C.*, 332 Ga. App. at 742.

[12] *In the Interest of S. O. C.*, 332 Ga. App. at 742.

[13] *Id.* at 742-43. Indeed, unlike a custody proceeding, the termination of a natural parent's right to familial relations with his or her child "leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development." *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 39 (I) (A) (101 SCt 2153, 68 LE2d 640) (1981) (Blackmun, J., dissenting).

[14] *In the Interest of L. J. L.*, 247 Ga. App. 477, 479 (543 SE2d 818) (2001) (punctuation omitted); *In the Interest of S. O. C.*, 332 Ga. App. at 743; *In the Interest of J. V. J.*, 329 Ga. App. at 429; *In the Interest of K. J.*, 226 Ga. App. 303, 306 (1) (486 SE2d 899) (1997).

Accordingly, "compelling facts" are required to terminate parental rights.[15] And while the juvenile court may consider past parental conduct in deciding whether the cause of deprivation is likely to continue,[16] evidence of past unfitness, standing alone, is "insufficient to terminate the rights of a parent in her natural child."[17] Rather, clear and convincing evidence of "present unfitness is required."[18] Finally, this Court has repeatedly recognized that the constitutional right to "raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only

---

[15] *In the Interest of J. V. J.*, 329 Ga. App. at 424 (punctuation omitted); *accord Carvalho v. Lewis*, 247 Ga. 94, 94 (274 SE2d 471) (1981); *see also In the Interest of S. O. C.*, 332 Ga. App. at 743; *In the Interest of K. J.*, 226 Ga. App. at 306 (1).

[16] *In the Interest of D. W.*, 294 Ga. App. 89, 92 (1) (c) (668 SE2d 533) (2008); *accord In the Interest of J. V. J.*, 329 Ga. App. at 424; *In the Interest of A. H.*, 289 Ga. App. 121, 123 (1) (a) (656 SE2d 254) (2008).

[17] *In the Interest of C. J.V.*, 323 Ga. App. at 285 (punctuation omitted); *accord In the Interest of J. V. J.*, 329 Ga. App. at 424; *In the Interest of D. L. T. C.*, 299 Ga. App. 765, 769 (1) (684 SE2d 29) (2009).

[18] *In the Interest of C. J. V.*, 323 Ga. App. at 285 (punctuation omitted); *accord In the Interest of J. V. J.*, 329 Ga. App. at 424-25; *In the Interest of D. L. T. C.*, 299 Ga. App. at 769 (1).

13

under the most compelling circumstances."[19] With these guiding principles in mind, we turn now to the mother's enumerations of error.

1. First, the mother argues that there was insufficient evidence to show that D. M. and B. A. M. were dependent due to a lack of proper parental care and control and that, if the children were dependent, there was insufficient evidence to show that any dependency was likely to continue. We disagree as to both contentions.[20]

(a) *The children were dependent due to a lack of proper parental care and control.* First, the current version of OCGA § 15-11-311 provides that, *inter alia*, in determining whether a child lacks proper parental care or control, the trial court shall consider, but is not limited to, "[a] medically verified deficiency of such child's parent's physical, mental, or emotional health that is of such duration or nature so as

---

[19] *In the Interest of J. V. J.*, 329 Ga. App. at 425 (punctuation omitted); *accord In the Interest of C. J. V.*, 323 Ga. App. at 283; *In the Interest of J. C.*, 242 Ga. 737, 738 (1) (251 SE2d 299) (1978); *In the Interest of M. A.*, 280 Ga. App. 854, 856 (635 SE2d 223) (2006); *In the Interest of T. J. J.*, 258 Ga. App. 312, 314 (574 SE2d 387) (2002).

[20] The mother does not argue that there was insufficient evidence that "reasonable efforts to remedy the circumstances have been unsuccessful or were not required" and, accordingly, we do not address that factor of OCGA § 15-11-310 (a) (5). *See In the Interest of J. V. J.*, 329 Ga. App. at 425 n.15 (noting that because mother only challenged the sufficiency of the evidence as to one factor in termination of her rights, this Court did not consider the other factors because those arguments were abandoned).

14

to render such parent unable to provide adequately for his or her child"[21] and "[p]hysical, mental, or emotional neglect of his or her child or evidence of past physical, mental, or emotional neglect by the parent of such child or another child of such parent."[22] Further, this Code section provides that in determining whether a child who is not in the parent's custody and care is without proper parental care and control, the trial court shall *also* consider, though is not limited to considering, whether the parent, without justifiable cause, has "failed significantly for a period of six months prior to the date of the termination hearing" to (1) develop and maintain a parental bond with the child in a meaningful, supportive manner; (2) provide for the care and support of the child as required by law or judicial decree; and (3) comply with a court-ordered plan that was designed to reunite the parent and child.[23]

In the case *sub judice*, the mother did not appeal from the juvenile court's prior determinations that the children were deprived and/or dependent.[24] Thus, we assume

---

[21] OCGA § 15-11-311 (a) (1).

[22] OCGA § 15-11-311 (a) (5).

[23] OCGA § 15-11-311 (b) (1)-(3).

[24] Because the Department initiated proceedings and the court made findings of deprivation and/or dependency in April 2011, May 2012, and July 2014, both the new and old Juvenile Code applied at different times. *See supra* note 6.

that the evidence was sufficient to show deprivation/dependency at those times.[25] And after reciting the facts that formed the basis of the prior findings of deprivation and/or dependency, the court concluded that they were "compelling evidence of past *and present* parental unfitness."[26] Specifically, the trial court highlighted the repeated instances of inadequate food, clothing and shelter; inadequate supervision, including the very young children being found unattended in the street on multiple occasions throughout the mother's history with the Department; the mother's resistance towards acquiring recommended therapy for D. M. due to her denial that he needed same; injuries that were sustained by the children; and the psychologist's ultimate recommendation that the mother not be reunited with the children. As previously noted, the psychologist based that recommendation upon her finding that the mother's personality disorder prevented her from making lasting changes and resulted in immediate regression each time the children were returned to her custody, and she

---

[25] *See In the Interest of T. M.*, 329 Ga. App. 719, 723 (1) (a) (766 SE2d 101) (2014) ("For purposes of our review, we assume that the evidence was sufficient to show that [the child] was deprived since the mother did not appeal that determination."); *In the Interest of R. A. R.*, 259 Ga. App. 680, 684-85 (1) (577 SE2d 872) (2003) ("The children's deprivation was established by orders of the juvenile court, which were not appealed. The mother is therefore bound by the findings in those orders.").

[26] (Emphasis supplied).

16

also opined that the diagnosis explained the mother's lack of progress despite the Department providing numerous services to her over the years.[27]

Accordingly, there was sufficient evidence that D. M. and B. A. M. were dependent at the time of the termination hearing due to a lack of proper parental care and control.[28]

(b) *The children's dependency is likely to continue or will not likely be remedied*. After detailing the foregoing facts (which provided a basis for finding dependency due to a lack of proper parental care and control), the trial court noted that even after receiving extensive services, the mother "has been unable to demonstrate an ability to care for her children once they are returned to her care." The

---

[27] The trial court also noted that the mother had been ordered to pay child support while the children were in foster care but that she had failed to regularly pay and was currently in arrears. *But see In the Interest of J. V. J.*, 329 Ga. App. at 424 ("A parent's poverty alone is an insufficient basis to terminate parental rights."); *In the Interest of C. J. V.*, 323 Ga. App. at 287 ("[I]t is well established that poverty alone is not a basis for termination." (punctuation omitted)).

[28] *See In the Interest of P. D. W.*, 296 Ga. App. 189, 194 (1) (b) (674 SE2d 338) (2009) (holding that mother's lack of parental care and control were the cause of deprivation when the mother, *inter alia*, failed to undergo court-mandated drug treatment and provide adequate housing); *In the Interest of R. A. R.*, 259 Ga. App. at 876 (1) (holding that mother's lack of parental care and control were the cause of deprivation when, *inter alia*, there was evidence that mother suffered from psychological disorder that affected her ability to adequately care for her children, and she failed to provide adequate housing and medical care for her children).

17

evidence supported this finding because, again, the mother's inability was explained by the psychologist as being due to a personality disorder, which the doctor said impaired functioning, resulted in rigidity and/or inability to change, and resulted in the mother's immediate relapses to past inappropriate behaviors when no longer under Department supervision. The court also noted that the mother had been uncooperative with regard to the recommendation that D. M. receive the counseling he needed for his emotional well being. There was, then, evidence to support the court's finding that "the conditions of dependency of the child[ren] remain and are not likely to be remedied . . . ."[29]

2. In her final enumerations of error, the mother argues that there was insufficient evidence that any continued dependency was likely to cause serious physical, mental, emotional, or moral harm to D. M. and B. A. M., and that there was

---

[29] *See In the Interest of R. N. H.*, 286 Ga. App. 737, 741-42 (1) (c) (650 SE2d 397) (2007) (holding that trial court's finding that deprivation was likely to continue was supported by the fact that, *inter alia*, father's drug abuse remained untreated, father had been incarcerated repeatedly, and the family still did not have adequate housing for children); *In the Interest of J. S. B.*, 277 Ga. App. 660, 662-63 (2) (c) (627 Se2d 402) (2006) (holding that trial court's finding that deprivation was likely to continue was supported by the fact that mother was shown to have difficulty developing parenting skills, counselor testified that she did not believe mother would be able to develop appropriate skills in light of mental and emotional deficiencies, and mother failed to consistently participate in treatment for her mental-health condition).

insufficient evidence that termination of her rights was in the boys' best interests. Because the trial court failed to provide the requisite findings of fact, we must vacate and remand to the trial court to make appropriate findings.

(a) *The dependency was likely to cause serious physical, mental, emotional, or moral harm.* It is well established that an order terminating parental rights must "contain explicit findings supporting the conclusion that the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child."[30] Indeed, the propriety of a termination order is "inextricably intertwined with one of this republic's oldest and most sacred fundamental liberties—the right to maintain familial relations and integrity."[31] To this end, a mere recitation that this

---

[30] *In the Interest of D. T. A.*, 312 Ga. App. 26, 33 (1) (d) (717 SE2d 536) (2011); *accord In the Interest of K. J.*, 226 Ga. App. 303, 307 (2) (b) (486 SE2d 899) (1997); *see Beasley v. Jones*, 149 Ga. App. 317, 319 (1) (254 SE2d 472) (1979) (reversing trial court when termination order did not specify facts supporting court's conclusion that child would likely suffer serious emotional harm).

[31] *In the Interest of J. E.*, 309 Ga. App. 51, 63 (711 SE2d 5) (2011) (Dillard, J., dissenting); *see also Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 503-04 (III) (97 SCt 1932, 52 LE2d 531) (1977) (plurality opinion) ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition.").

legal requirement was met will not suffice.[32] Instead, the juvenile-court judge must ascertain the facts and state "not only the end result of that inquiry but the process by which it was reached."[33] More precisely, the juvenile court must make explicit findings of fact with regard to the child or children at issue, rather than a hypothetical child placed in the subject child or children's situation.[34] And here, the juvenile court did the latter. Indeed, without providing *any* specific findings of fact based upon the evidence before it, the juvenile court merely cited to generalized concerns of doubt,

---

[32] *In the Interest of D. T. A.*, 312 Ga. App. at 33 (1) (d); *accord In the Interest of K. J.*, 226 Ga. App. at 307 (2) (b); *see also In the Interest of G. K. J.*, 187 Ga. App. 443, 445 (3) (370 SE2d 490) (1988) ("The juvenile court cannot make a bare recital as to a finding of the existence of parental misconduct or inability.").

[33] *In the Interest of D. T. A.*, 312 Ga. App. at 33 (1) (d) (punctuation omitted); *accord In the Interest of J. M.*, 251 Ga. App. 380, 383 (4) (554 SE2d 533) (2001); *Beasley*, 149 Ga. App. at 319 (1).

[34] *See In the Interest of J. E.*, 309 Ga. App. at 66 (Dillard, J., dissenting) ("[W]e have repeatedly held that a juvenile court is required to make explicit findings of fact that the child at issue—rather than some hypothetical child placed in the subject child's situation—will suffer or is likely to suffer *serious* harm as a result of the continued deprivation."); *accord In the Interest of C. J. V.*, 323 Ga. App. 283, 292 (746 SE2d 783) (2013) (Dillard, J., concurring fully and specially); *In the Interest of E. G.*, 315 Ga. App. 35, 48 (726 SE2d 510) (2012) (Dillard, J., concurring fully as to Div. 3 and in judgment only as to Div. 1 and 2); *In the Interest of A. E. S.*, 310 Ga. App. 667, 671 (714 SE2d 148) (2011) (Dillard, J., concurring specially).

uncertainty, hesitancy in life, and the need for stability and permanence. This will not

do. In a termination proceeding,

> each child in these circumstances deserves and requires a full, separate, and thoughtful review by the juvenile court of the issues relating to [the child], and this cannot and will not happen if the child is treated as if she were merely part of some detached hypothetical inquiry—rather than as what she actually is, a human being with inherent dignity and worth.[35]

Without *specific* factual findings as to D. M. and B. A. M. on the question of the likelihood of serious harm from continued deprivation, "we have no basis to evaluate whether the juvenile court properly determined that clear and convincing evidence supported the court's conclusion on that issue."[36] Accordingly, even though we are extremely troubled by the mother's history with the Department, we are nevertheless required to vacate the judgment of the juvenile court and remand the case with the direction that the court make appropriate and explicit findings of fact

---

[35] *In the Interest of J. E.*, 309 Ga. App. at 66-67 (Dillard, J., dissenting) (punctuation omitted); *see also Crook v. Ga. Dep't of Human Res.*, 137 Ga. App. 817, 818 (224 SE2d 806) (1976) ("If [the juvenile court] is required to make the explicit statutory findings, the tendency to rely upon individualistic and subjective notions of morality or sociological advantage will be lessened.").

[36] *See In the Interest of D. T. A.*, 312 Ga. App. at 33 (1) (d).

and conclusions of law, and enter a new judgment based on these findings and conclusions.[37]

(b) *Termination was in the children's best interest.* Having determined that it is necessary to remand for further proceedings on an issue that is a prerequisite for considering whether the juvenile court erred in finding that termination of the mother's parental rights was in the children's best interests, we cannot reach that question.[38] However, we note that the juvenile court's order is deficient in this area as well, again providing only a mere recitation that the court considered the relevant factors as to the children's best interests[39] without any specific findings as to D. M. and B. A. M. For the same reasons as those set forth in Division 2 (a) *supra*, the

---

[37] *See id.* at 34 (1) (d) (vacating and remanding for appropriate findings of fact); *In the Interest of T. S.*, 310 Ga. App. 100, 104 (2) (712 SE2d 121) (2011) (same); *In the Interest of S. W. J. P. D.*, 275 Ga. App. 272, 273 (620 SE2d 497) (2005) (same).

[38] *See In the Interest of D. T. A.*, 312 Ga. App. at 34 (2) ("Having found it necessary to remand this case for further proceedings as to issues that are prerequisites for consideration of the question whether the court erred in finding that the termination of parental rights was in the children's best interest, we cannot reach that question."); *see* OCGA § 15-11-310 (a), (b) (providing that consideration of the child or children's best interest occurs only after the court determines that the statutory grounds for termination have been met).

[39] *See* OCGA § 15-11-310 (b) (1)-(4).

22

juvenile court, should it reach this question again on remand, must provide appropriate and specific findings of fact on this issue as well.

For all of the foregoing reasons, we vacate the juvenile court's judgment and remand for further proceedings consistent with this opinion.

*Judgment vacated and case remanded with direction. Phipps, P. J., and Peterson, J., concur.*