**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**BRANCH and PETERSON, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**December 8, 2016**

# In the Court of Appeals of Georgia

A17A0096. IN THE INTEREST OF A. S., T. S., I. S., AND T. P.

PETERSON, Judge.

The mother of four young children, A. S., T. S., I. S., and T. P., appeals from the termination of her parental rights.[1] She argues that termination of her rights was against the weight of the evidence, and that the juvenile court erred by allowing a supervisor from the Division of Family and Children Services ("DFCS") to testify as an expert witness. We reverse because the State did not sufficiently establish that the children are likely to suffer harm under the status quo.

Viewed in the light most favorable to the judgment below, *In the Interest of M. S. S.*, 308 Ga. App. 614, 614 (708 SE2d 570) (2011), the evidence shows that the

---

[1] The parental rights of the father were terminated, as well, but that is not an issue in this appeal.

children came to the attention of DFCS when the youngest child, T. P., tested positive for cocaine at his birth in July 2014. On that same day, T. P.'s mother also tested positive for cocaine and marijuana. The mother had tested positive for both drugs the preceding month, and admitted to smoking marijuana and using cocaine while pregnant. DFCS issued a safety plan placing the children with their maternal grandparents.

The mother continued to test positive for cocaine, marijuana, and oxycodone until she was arrested in September 2014. Following her release from jail, she began to test negative on her drug screens for several months beginning in December 2014, but had trouble attending meetings due to her work schedule and was referred to an in-home provider. The criminal charges against her were dismissed.

On December 12, 2014, the juvenile court entered an order finding that the children were dependent due to the parents' continued substance abuse and the mother's unresolved mental health issues and transferred temporary custody of them to DFCS. The juvenile court directed that the reunification case plan for the mother contain provisions requiring, among other things, that the mother remain drug and alcohol free and test negative on random drug screens for at least six consecutive months, maintain clean and stable housing, complete a psychological evaluation,

complete recommended drug and alcohol counseling, complete mental health counseling or therapy, maintain regular employment or have income sufficient to support the family, and support the minor children as required by law.

On March 6, 2015, the juvenile court entered a judicial review order finding that the children remained dependent because although the mother was making progress on her case plan, she had not been participating in drug treatment, and further progress was needed. The mother continued to visit her children and missed less than five out of 130 visits. Of the few visits she missed, one was because she was denied visitation after arriving one minute late.

The mother tested positive for benzodiazepines in May 2015, which she denied taking, stating that she had taken what she believed to be an Aleve obtained from a co-worker for a headache. The mother's following drug screen was negative, but then she began refusing drug screens.[2] The DFCS supervisor claims that the mother admitted that she used marijuana, but the mother denied this, stating that she was in a room where marijuana was being smoked and was concerned she would test positive. Prior to the permanency hearing, DFCS noted that she also had not

---

[2] The mother was advised that DFCS would consider a refusal to be a positive drug screen for the purposes of determining compliance with the case plan.

completed the required progress toward the goals of providing stable and safe housing and stable income. DFCS indicated that it intended to terminate her parental rights. The three oldest children were moved into foster care in September 2015 when their maternal grandparents were no longer able to care for them.

DFCS filed a petition to terminate the parental rights of the children's parents on January 14, 2016. At the hearing, which was held in March 2016, the DFCS supervisor testified regarding the department's involvement with the children. The supervisor indicated that the mother had been "primarily consistent with keeping employment" through a series of fast-food jobs.[3] The mother had also been staying in a trailer owned by her sister since 2014, though the supervisor testified that it was without electricity for a period of several months. Additionally, the supervisor testified that although the mother had originally attended out-patient drug counseling, she stopped going because "she did not feel like she needed it any longer" and because she was having difficulty attending due to her work schedule. The mother was referred to in-home substance abuse services, which she successfully completed. However, after failing the drug screen in May 2015, the mother failed to attend

---

[3] The supervisor did complain that the mother had left jobs without a good reason and had not consistently provided documentation of her hours or wages.

4

consistently substance abuse and medication management treatment. The mother also failed to complete counseling following a domestic violence incident that occurred during a transitional visit with the children. The supervisor testified that the mother had been prescribed some medication, though she was unsure what for, and that the mother had indicated that she did not want to take the medication. However, the mother testified that she had been taking medication that she has found it helpful. Finally, the supervisor testified that both parents owed a total of $920 in ordered child support.[4]

The State tendered the DFCS supervisor as an expert with respect to the effects of keeping the children in foster care, the mother objected on the basis that the witness had an interest in the case, and the juvenile court overruled her objection. The expert testified that if permanency was not established for the children at their tender ages, they would have a hard time forming healthy attachments to others and would be at increased risk of delinquency. She further testified that the children would be harmed by maintaining visitation with their parents because they would face confusion and uncertainty due to their inability to return home to their parents.

---

[4] The mother testified that she, and not the father, had been the only one attempting to pay the court-ordered child support.

5

At the end of the hearing, the juvenile court stated that the "issue here is compliance . . . . To me, you must have completed 90 — 95 percent of your goals . . . . And if you haven't, I'm going to terminate your rights." In its order terminating the parents' rights, the juvenile court found that the mother failed to comply with the reunification plan. The court concluded that because the mother had continued to use drugs, had not supported the children, and had not maintained stable and suitable housing, the children's "dependency is likely to continue and will not likely be remedied and will likely cause serious physical, mental or emotional harm to the children." With respect to the emotional, and mental health needs of the children, the court found that the children needed a sense of permanency, commitment, and continuity not available through foster care. The mother filed an application for discretionary appeal, which this Court granted.

The mother argues that the termination was against the weight of the evidence. But the mother does not make any clear argument as to precisely where the juvenile court erred; instead, the mother simply presents various facts — that she had ended her relationship with the father who she claims had a "negative effect" on her, had been the only parent to pay some portion of the ordered child support, maintained stable employment and residence, completed required parenting classes, completed

a drug assessment and drug treatment, maintained regular contact with and regularly visited her children, and failed only one drug test, because of a pill she believed to be an over-the-counter pain reliever. Regardless of these issues, we reverse because the State did not sufficiently establish that the children would suffer harm under the current arrangement.

OCGA § 15-11-310(a) provides that a court considering termination of parental rights must first determine whether at least one of five statutory grounds for termination has been met. Here, the trial court terminated the mother's rights under OCGA § 15-11-310(a)(5), which provides that a ground for termination exists when:

> A child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.

Among the grounds on which a juvenile court may find a child dependent due to lack of proper parental care and control are: (1) a parent's "[e]xcessive use of or history of chronic unrehabilitated substance abuse with the effect of rendering a parent of such child incapable of providing adequately for the physical, mental,

7

emotional, or moral condition and needs of his or her child;" (2) a parent's "[p]hysical, mental, or emotional neglect of his or her child or evidence of past physical, mental, or emotional neglect by the parent of such child or another child of such parent;" and (3) a parent's failure, without justifiable cause, to "significantly for a period of six months prior to the date of the termination hearing . . . [t]o provide for the care and support of his or her child as required by law or judicial decree . . . and . . . [t]o comply with a court ordered plan designed to reunite such parent with his or her child." OCGA § 15-11-311(a)(2), (a)(5), (b)(2 & 3). The juvenile court relied on each of these grounds in terminating the mother's parental rights here.

Once the juvenile court has found that the statutory grounds for termination have been met, the juvenile court then considers whether termination is in the child's best interest after considering several specified factors. OCGA § 15-11-310(b). Grounds for termination must be proven by clear and convincing evidence. OCGA § 15-11-320(a). The juvenile court's order terminating parental rights must "[c]ontain written findings on which the order is based, including the factual basis for a determination that grounds for termination of parental rights exist and that termination is in the best interests of the child[.]" OCGA § 15-11-320(b)(1).

8

1. By arguing that the termination was "against the weight of the evidence," the mother implicitly challenges the juvenile court's finding of dependency, though she did not appeal from the juvenile court's prior determinations that the children were dependent. Thus, we assume that the evidence was sufficient to show dependency at those times. *See In the Interest of D. M.*, No. A16A1295, 2016 WL 6134092, at \*5, 2016 Ga. App. LEXIS 576, at \*15-\*16 (1) (a) (Ga. Ct. App. Oct. 20, 2016). After reciting the facts that formed the basis for the prior findings of dependency, the juvenile court concluded that the children remained dependent. Specifically, the juvenile court highlighted the mother's continuing substance abuse evidenced by her prior positive drug screen and several refused screenings (which DFCS treated as positive). The juvenile court also pointed to her inability to pay even a symbolic amount of child support or to provide stable housing, as indicated by the numerous months her residence was without power, during which time she stayed with other relatives. These findings supported the trial court's conclusion that the children were dependent at the time of the termination hearing due to a lack of proper parental care and control. *See In the Interest of P. D. W.*, 296 Ga. App. 189, 194 (1) (b) (674 SE2d 338) (2009) (holding that the mother's lack of parental care and control

9

were the cause of deprivation when the mother failed to undergo court-mandated drug treatment and obtain adequate housing, among other things).

2. As to whether the children's dependency is likely to continue, the trial court noted that "[r]easonable efforts to remedy the circumstances have been unsuccessful[,]" and pointed to the mother's inability to remain drug-free, pay the symbolic amount of child support, or maintain stable housing. The mother testified that she, and not the father, had been the only one who had paid any portion of the court-ordered child support, though she did not refute that more was owed. And the testimony showed that the mother had been able to maintain the same residence, with the exception of the several months that it was without power. Were the mother's problems paying the ordered child support and maintaining stable and clean housing the only issues supporting the juvenile court's finding that the deprivation is likely to continue, we would have a much harder time affirming this aspect of the juvenile court's decision, as the mother was making progress toward remedying those challenges that appear to stem largely from her poverty. *See In the Interest of S. R. R.*, 330 Ga. App. 817, 820 (769 SE2d 562) (2015) ("This Court will not sustain the termination of a mother's right to raise her child, based on . . . her poverty" when it does not render her "incapable of caring for her child."). However, in finding that the

10

children's deprivation was likely to continue, the juvenile court also pointed to the mother's inability to remain drug free, and specifically her failed and refused drug screenings.

The mother admitted using marijuana and cocaine during her pregnancy. When her youngest child was born, both she and the child tested positive for cocaine and marijuana. This prompted DFCS to remove the children to the care of the mother's parents. The mother continued testing positive for cocaine and marijuana, as well as oxycodone, in the following months. After she was arrested and began drug treatment, the mother had some negative drug screens. However, in May 2015, the mother tested positive for benzodiazepines, which she denied intentionally taking. The mother's following drug screen was negative, but then she began refusing drug screens despite being advised the refusal would be treated as a positive screen by DFCS. The DFCS supervisor claims that the mother admitted to using marijuana, but the mother denied this, stating that she was in a room where marijuana was being smoked and was concerned she would test positive. The mother also failed to complete substance abuse counseling following her positive drug screen.

The juvenile court was entitled to weigh the mother's credibility when she denied intentionally using drugs, as well as her explanation for refusing some of the

11

subsequent drug screens. *In the Interest of A. M. H.*, 292 Ga. App. 318, 319 (665 SE2d 8) (2008) ("On appeal, this Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the juvenile court's fact-finding and affirm unless the appellate standard is not met."); *In the Interest of K. C. W.*, 297 Ga. App. 773, 777 (1) (678 SE2d 213) (2009) (juvenile court "was entitled to give little credence" to mother's claim of recent improvements with respect to her substance abuse issues). Moreover, "[i]n determining whether the cause of deprivation is likely to continue, the juvenile court may consider the parent's past conduct[.]" *In the Interest of D. W.*, 294 Ga. App. 89, 92 (1) (c) (668 SE2d 533) (2008). "And it may assign much less weight to assertions of sudden parental fitness when compared to the other evidence." *Id.* A juvenile court's finding that a parent is highly likely to continue using illegal drugs supports the conclusion dependency is likely to continue. *See, e.g.*, *In the Interest of A. B.*, 274 Ga. App. 230, 232 (617 SE2d 189) (2005) (affirming termination where mother continued to struggle with drugs while children were in State care and failed to achieve financial and residential stability). There was, then, evidence to support the juvenile court's finding that the children's dependency was likely to continue and would not likely be remedied.

3. We must next examine whether there was clear and convincing evidence that the children's continued dependency was likely to cause serious physical, mental, emotional, or moral harm. *See* OCGA § 15-11-310(a)(5). A finding that dependency is likely to continue does not necessarily justify a finding of harm, although facts authorizing such a finding also could support a finding of harm in particular circumstances. *See In the Interest of J. E.*, 309 Ga. App. 51, 57 (1) (d) (711 SE2d 5) (2011) (whole court) (analyzing under "deprivation" standard of former Juvenile Code). Rather, in determining whether harm to the child exists, "our law requires a juvenile court to consider both the relationship between the parent and child at the time of the termination hearing and what might happen if the child were returned to the parent." *In the Interest of E. M. D.*, No. A16A0986, 2016 WL 6395633, at *8, 2016 Ga. App. LEXIS 598, at *28 (II) (B) (Ga. Ct. App. Oct. 28, 2016). Thus, the court must assess whether a child currently in foster care is likely to suffer serious harm as a result of continued dependency if the child remains indefinitely in foster care, and "also the likelihood of harm if the child returns to the custody of his parent, notwithstanding that the deprivation persists." *In the Interest of C. L.*, 315 Ga. App. 607, 611-12 (1) (b) (727 SE2d 163) (2012). The State must show that both scenarios would likely cause serious harm in order for a termination of parental rights to be

13

justified. *See E. M. D.*, 2016 WL 6395633, at \*8, 2016 Ga. App. LEXIS 598, at \*28-\*29.

Moreover, "an order terminating parental rights must contain explicit findings supporting the conclusion that the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child." *D. M.*, 2016 WL 6134092, at \*7, 2016 Ga. App. LEXIS 576 at \*20 (2) (a) (footnote and punctuation omitted). "Indeed, the propriety of a termination order is inextricably intertwined with one of this republic's oldest and most sacred fundamental liberties — the right to maintain familial relations and integrity. To this end, a mere recitation that this legal requirement was met will not suffice." *Id.* (footnotes and punctuation omitted). Instead, the juvenile court must "ascertain the facts and state not only the end result of that inquiry but the process by which it was reached." *Id.* at 2016 WL 6134092, at \*7, 2016 Ga. App. LEXIS 576 at \*20-\*21 (2) (a) (footnote and punctuation omitted).

In its order, the juvenile court found that the children would suffer harm if they remained in foster care because they would "experience doubt, uncertainty and hesitancy in life[.]" The juvenile court further stated that foster care would not provide the kind of stability the children needed, and would put them at risk of

14

delinquency, other anti-social behavior, and "foster care drift." And at the hearing, the expert testified the children would be especially susceptible to these risks due to their young ages. But this testimony did not rise substantially above general assertions that long-term foster care is harmful. And there was no evidence that the children's continued relationship with their mother was harmful. Such testimony is insufficient to show how each individual child will be harmed by the status quo to the degree necessary to justify termination of the mother's parental rights. *See E. M. D.*, 2016 WL 6395633, at *10, 2016 Ga. App. LEXIS 598, at *35-*38 (generalized finding "that the children would experience harm absent the stability and permanency of an adoptive home" not a sufficient finding of harm); *D. M.*, 2016 WL 6134092, at *7 (2) (a), 2016 Ga. App. LEXIS 576 at *21 ("generalized concerns of doubt, uncertainty, hesitancy in life, and the need for stability and permanence" insufficient; "each child . . . deserves and requires a full, separate, and thoughtful review by the juvenile court of the issues relating to the child"). *Compare In re S. P.*, 336 Ga. App. 488, 499-500 (2) (c) (784 SE2d 846) (2016) (adequate showing of harm where mother's recurring psychological and repeated incarcerations prevented development of parental bond, the provision of stability for the child, and caused child distress

during visitation).[5] Accordingly, even though we are extremely troubled by the mother's history of drug use and question whether she will ever be able to regain custody of her children, we are nevertheless required to reverse the juvenile court's judgment.[6]

*Judgment reversed. McFadden, P. J., and Branch, J., concur.*

---

[5]Although we do not consider whether a child would be better off with a foster family when deciding to sever the natural parent-child relationship, *see In the Interest of S. O. L.,* 332 Ga. App. 738, 746 (3) (774 SE2d 785) (2015), we also note that the testimony in the record was that no adoptive home had been identified for the children.

[6] Because of our holding here, we need not reach the mother's argument that the juvenile court erred in allowing a DFCS supervisor to testify as an expert, although the mother did not object to this effect at trial and therefore likely waived this argument in any event. *See Fulbright v. State*, 194 Ga. App. 827, 828 (3) (392 SE2d 298) (1990) ("This Court will review and correct only such error as was made in the trial court and only on the specific basis on which it was presented to the trial court.").