A01A0597. IN THE INTEREST OF H. L. W., a child.

(547 SE2d 799)

PHIPPS, Judge.

The Henry County Juvenile Court terminated the parental rights of the biological parents of H. L. W. The father appeals,[1] arguing that the court erred in finding that he had abandoned the minor child. Because the evidence was sufficient to support the court's determination, we affirm.

Before terminating parental rights, a juvenile court must employ a two-prong test.[2] First, the court determines whether there is clear and convincing evidence of parental misconduct or inability.[3] If so, then the court must consider whether the termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs.[4]

1. As to the first prong of the test, abandonment constitutes parental misconduct or inability.[5] To find an abandonment, "there must be sufficient evidence of an actual desertion, accompanied by an intention to sever entirely, so far as possible to do so, the parental relation, throw off all obligations growing out of the same, and forego all parental duties and claims."[6]

On appeal, we view the evidence in the light most favorable to the appellee and determine whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost.[7] We do not weigh the evidence or determine witness credibility but defer to the juvenile court's factfinding.[8]

Viewed in this light, the evidence shows the following. H. L. W. was born on March 7, 1997. His parents separated seven months after his birth. H. L. W.'s father took custody of him for about two

---

[1] The mother is not a party to this appeal.

[2] OCGA § 15-11-94 (a). The 2000 amendment, effective July 1, 2000, redesignated former Code section 15-11-81 as present Code section 15-11-94.

[3] Id.

[4] Id.

[5] OCGA § 15-11-94 (b) (3); *In the Interest of L. S.,* 244 Ga. App. 626 (536 SE2d 533) (2000).

[6] (Citations and punctuation omitted.) *In the Interest of L. S.,* supra.

[7] Id. at 626-627.

[8] Id. at 627.

weeks and then let his mother have him. Then the father, alone, moved to Minnesota, and later to Wisconsin. From late October 1997 until March 1998, H. L. W. lived with his mother. During that time, he saw his father once, in January 1998, when his mother took him to his paternal grandparents' home in Wisconsin. The mother testified that during the five months that H. L. W. lived with her, the father provided only $100 in financial support. By March 1998, the mother had decided that she no longer could provide financially for H. L. W. She took him to her cousin's home in Henry County and asked her cousin and her cousin's husband to adopt the child.

At that time, the father was living in Minnesota with his brother in a one-bedroom apartment and had been working as a delivery man since January 1998. In May 1998, he lost that job and moved in with his parents. From May until November, his sole source of income was from part-time service in the National Guard, where he earned approximately $150 each month. In November 1998, he joined the United States Marine Corps. And in April 1999, in addition to his regular military income, he began receiving a monthly military dependency allowance of $300 for having a wife and child.

At the continuation of the termination hearing on July 23, 1999, the father admitted that he knew in March 1998 that H. L. W. was living with the mother's cousin in Georgia and that he had the cousin's telephone number. According to the cousin, he called "a couple of times" between March and December 1998, once in January 1999, and once in February 1999. Although the cousin invited the father to visit his child, he did not. Nor did he provide any financial support for a year.

From March 1998 until March 1999, the mother's cousin and her husband took care of H. L. W., providing all of his food, clothing, shelter, and medical care. In March 1999, wanting to provide a permanent home for H. L. W., the couple petitioned for the termination of his mother's and father's parental rights. About that time, the father sent H. L. W. a stuffed animal, a toy car, and a few books. The next month, he sent a $300 bad check. When the father came to Georgia for the termination hearing in June 1999, he gave the cousin a $300 money order.

Because H. L. W.'s mother failed to appear at the June termination hearing, the court continued it. And the court scheduled two days of visitation between the father and H. L. W. On the first day, the father showed up an hour and a half late; on the second day, he was a half-hour late. At the continuation of the hearing in July, the father admitted that he had made no subsequent plans to see his son and that he was unable to take immediate custody because he was living in the military barracks, although he had applied for base housing. He asked for joint custody and for H. L. W.'s mother to take

immediate custody of the child. When asked what she wanted, the mother responded, "I would like to take him home. I want to do what — I mean, I don't know if taking him home today would be the best thing. I mean, I would be willing to work to get him back home with me, yes." She acknowledged that when she had placed the child with her cousin, she wanted her cousin's family eventually to adopt him and had signed an affidavit saying so. She stated that her cousin's family had provided a good home for H. L. W.

The guardian ad litem recommended that based on the child's needs for financial and emotional stability, it was in the child's best interest for the father's parental rights to be terminated and for H. L. W. to be placed in the custody of the mother's cousin and her husband.

The juvenile court found that the father had abandoned H. L. W. as contemplated by OCGA § 15-11-94 (b) (3)[9] and terminated his parental rights. The father claims that he never consented to the cousin having custody of the child and argues that the evidence is insufficient to support a finding of abandonment. But the evidence shows that the father relocated to Minnesota and that other than providing $100 to the mother and making sporadic calls to the cousin, he essentially ignored all responsibility for supporting the child for approximately 18 months. He has made no formal attempt to gain custody, and in light of the termination of the mother's parental rights, he has failed to articulate any specific plans for H. L. W.'s care. He continues to demonstrate an unwillingness or inability to provide for H. L. W. and to establish and maintain a parental relationship with him. Although the father maintains that he never intended to sever parental relations with H. L. W., the evidence authorizes a different finding. We conclude that the record reflects sufficient evidence for a rational trier of fact to find by clear and convincing evidence that the father abandoned H. L. W. for purposes of OCGA § 15-11-94 (b) (3).[10] Abandonment constitutes parental misconduct or inability and is a ground for termination of parental rights.[11]

2. As to the second prong of the test for termination of parental rights, the same evidence which shows parental misconduct or inability also can support a finding that the termination of parental rights is in the child's best interest. Our review of the entire record reveals sufficient evidence to support the juvenile court's finding that the termination of the father's parental rights would be in H. L. W.'s best interest.

---

[9] Previously OCGA § 15-11-81 (b) (3).

[10] See *In the Interest of L. S.*, supra at 627-628 (1).

[11] Id. at 626.

*Judgment affirmed. Smith, P. J., and Barnes, J., concur.*

DECIDED MAY 14, 2001.

Schrade & Richardson, Richard D. C. Schrade, Jr., for appellant.
Bach, Carver & Dewberry, Tara G. McNaull, for appellee.