**SECOND DIVISION**
**RICKMAN, C. J.,**
**MILLER, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 3, 2023**

# In the Court of Appeals of Georgia

A22A1471. IN THE INTEREST OF N. E. K., a child.

A22A1472. IN THE INTEREST OF N. E. K., a child.

RICKMAN, Chief Judge.

The mother and father of N. E. K. appeal the juvenile court's order terminating their parental rights. Both parents contend that the evidence does not support the judgment. For the reasons that follow, we reverse in both cases.

"In considering these appeals, this Court views the evidence in the light most favorable to the juvenile court's disposition and determines whether any rational trier of fact could have found by clear and convincing evidence that the appellants' parental rights should have been terminated." *In re D.B.C.*, 292 Ga. App. 487, 487 (664 SE2d 848) (2008). "Moreover, this Court neither weighs the evidence nor

determines the credibility of the witnesses, but instead defers to the juvenile court's findings of fact." (Citation and punctuation omitted.) Id.

The Candler County Division of Family and Children Services (DFACS) took N. E. K into care on August 25, 2020, after determining that she lacked a legal custodian because both of her parents were incarcerated. The mother has been incarcerated since October 2016 on a charge of transportation of a minor with intent to engage in criminal sexual activity, and her release date is in 2025. The father has been incarcerated since November 2019 on charges of conspiracy to commit access device fraud and aggravated identity theft, and his release date is in 2022.[1]

DFACS filed a dependency petition on August 31, 2020, and N. E. K. was found to be dependent in a September 8, 2020 order.[2] The finding of dependency has not been appealed by either parent.

The initial permanency plan was reunification with the parents, and a case plan was developed. The plan required them to maintain safe and appropriate housing, maintain legal and verifiable income, complete various assessments and follow all

[1] The father's anticipated release date was June 24, 2022, but this Court is not aware if he has been released.

[2] The September 8, 2020 order is not in the appellate record.

recommendations, submit to random drug screens, and pay nominal child support while their child was in foster care. In December 2020, N. E. K. was moved from a foster home to live with her maternal grandparents. Since that move, both parents have had regular virtual visits with their child.[3]

On February 9, 2021, the juvenile court entered an order changing the permanency plan to reunification concurrent with termination of parental rights and adoption.[4] On May 3, 2021, DFACS filed a petition to terminate the parental rights of both parents, alleging that they had abandoned their child. At the time of the termination hearing in July 2021, the mother had completed only one assessment, largely because of the limitations imposed by the federal prison, and had made no progress on the other plan goals due to her incarceration.

Evidence was presented at the termination hearing that the father had completed the requested assessments, but had not completed the services that were requested, had not made progress on housing because of his incarceration, and had not paid child support to DFACS. During one of his assessments, the father told the

---

[3] N. E. K. was born while her mother was incarcerated and their subsequent visitation has all been virtual.

[4] This order is not in the appellate record.

assessor that he never actually dated the mother and that N. E. K. was conceived while he was still married. He also told the assessor that he obtained custody of N. E. K. when she was eight or nine months old and that they moved to Atlanta and then to Denver, Colorado, where he met a woman who later became pregnant with his child.[5] The three of them then moved to Miami, Florida, but N. E. K. was with the woman's family in Candler County, Georgia when the father was arrested in Florida.

The juvenile court terminated parental rights to the child on two separate statutory grounds – abandonment and unremedied dependency.[6] As to abandonment, the court found that both parents had failed to communicate meaningfully with the child, participate in a court-ordered reunification plan, or provide financial support for the child since she entered foster care. With respect to unremedied dependency, the juvenile court found that the child remained dependent due to both parents' lack of parental care or control, reasonable efforts to remedy the circumstances have been unsuccessful, the cause of dependency is likely to continue or will not likely be

_____

[5] The father was established as N. E. K.'s biological father and served as her previous custodian pursuant to a court order from Indiana.

[6] The statutory grounds for termination of parental rights include, among others, a child being abandoned by his or her parent and a child being dependent due to lack of proper parental care or control by his or her parent. OCGA § 15-11-310 (a) (4), (5).

remedied in the reasonably foreseeable future, and returning the child to her parents or continuing the parent-child relationship will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. The juvenile court further found that termination of parental rights would be in the child's best interests[7] because N. E. K. had no significant attachment to either parent as they "are simply faces on a television screen and will be for the next several years," N. E. K. has adjusted well and is thriving in her placement in the home of her maternal grandparents, where her half-sibling also lives,[8] N. E. K. needs permanence, and termination of parental rights and adoption will ensure permanence for her. With respect to placement, the juvenile court concluded that continued placement with the maternal grandparents, who are willing to adopt, would be the least disruptive placement and offer N. E. K. the greatest degree of permanency and security, and specifically found that N. E. K. is bonded with the maternal grandmother but has no bond with the biological parents.

---

[7] If any of the statutory grounds for termination has been met, the juvenile court must then consider whether termination is in a child's best interests after considering numerous factors. OCGA § 15-11-310 (b).

[8] N. E. K.'s grandmother testified that she had been caring for the mother's other child since he was two years old and that he came into their care when the mother was incarcerated for a prior offense.

1. The mother contends that the juvenile court's determination that her incarceration justified termination of her parental rights is not supported by the evidence.

(a) The first basis for termination – abandonment – requires evidence "of an actual desertion, accompanied by an intention to sever entirely, so far as possible to do so, the parental relation, throw off all obligations growing out of the same, and forego all parental duties and claims." (Citation and punctuation omitted.) *In the Interest of H. L. W.*, 249 Ga. App. 600, 600 (1) (547 SE2d 799) (2001); see OCGA § 15-11-2 (1) (defines "abandonment" as "any conduct on the part of a parent, guardian, or legal custodian showing an intent to forgo parental duties or relinquish parental claims" and provides examples of conduct by the parent that may evidence the required intent). "To constitute abandonment, the [parent's] conduct must actually show an intent to abandon in light of the rest of the record." (Citation and punctuation omitted.) *In the Interest of H. A. S.*, 358 Ga. App. 54, 58-59 (2) (853 SE2d 371) (2020).

We conclude that the record does not support the juvenile court's finding that there was clear and convincing evidence that the mother abandoned N. E. K. during

6

the approximately 11 months between when the child came into DFACS custody and the termination hearing. The mother was unable to visit the child or complete many aspects of her case plan because she was incarcerated, but as the court noted, she attempted to participate in the required assessments and her lack of success was in large part due to the limitations imposed by the federal prison. The evidence shows that the mother has communicated with N. E. K. since she was placed with the maternal grandparents and that she has not missed any of her weekly video visits with N. E. K., except when N. E. K. was on vacation. The mother's release date is in 2025, but there was evidence that she could be released as early as April 2023. Under the circumstances, the required intent to abandon has not been shown. See *In the Interest of H. A. S.*, 358 Ga. App. at 59 (2) (no clear and convincing evidence of intent to abandon where incarceration limited father's ability to complete case plan, he attempted to contact child, and release date not shown to be many years away).

(b) The second basis for termination – unremedied dependency – exists when

[a] child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied in the reasonably foreseeable future, and: (A) Returning such child to his or her parent is likely to cause serious physical, mental, moral, or

7

emotional harm to such child or threaten the physical safety or well-being of such child; or (B) Continuation of the parent and child relationship will cause or is likely to cause serious physical, mental, moral, or emotional harm to such child.

OCGA § 15-11-310 (a) (5).

Assuming that there was sufficient evidence to support the juvenile court's findings as to the first three criteria, we consider the fourth – harm to the child.[9] The only reference to subsections (A) and (B) of this statute is found in the Conclusions of Law, which merely recites the statutory language. An order terminating parental rights must contain explicit findings supporting the conclusion of serious physical, mental, moral, or emotional harm to the child. See *In the Interest of A. S.*, 339 Ga. App. 875, 881 (3) (794 SE2d 672) (2016) (based on prior version of OCGA § 15-11-310 (a) (5), which required clear and convincing evidence that the child's continued dependency was likely to cause serious physical, mental, moral, or emotional harm).

Indeed, the propriety of a termination order is inextricably intertwined with one of this republic's oldest and most sacred fundamental liberties—the right to maintain familial relations and integrity. To this

[9] Because the mother remained incarcerated, the applicable inquiry was whether continuation of the parent and child relationship will cause or is likely to cause serious physical, mental, moral, or emotional harm to N. E. K.

8

end, a mere recitation that this legal requirement was met will not suffice. Instead, the juvenile court must ascertain the facts and state not only the end result of that inquiry but the process by which it was reached.

(Citations and punctuation omitted.) Id.

In its order, the juvenile court found harm based on Georgia's public policy to move quickly toward permanency for children in foster care, a child's need for permanence, the case manager's testimony describing the harm associated with moving this child from a stable home, and the lack of a relationship between the parents and the child. But generalized findings that a child will suffer harm absent the stability and permanency of an adoptive home are not sufficient. See *In the Interest of D. M.*, 339 Ga. App. 46, 56 (2) (a) (793 SE2d 422) (2016) (without specific factual findings on the question of the likelihood of serious harm, "we have no basis to evaluate whether the juvenile court properly determined that clear and convincing evidence supported the court's conclusion on that issue.") (citation and punctuation omitted). The record shows that N. E. K. is thriving in the home of her maternal grandparents, but there is no evidence in the record before us that maintaining the mother's relationship with N. E. K. while she remains in that home will itself cause

9

N. E. K. harm. In fact, the maternal grandmother testified that N. E. K. enjoys the time she spends talking to her mother.

We are of course troubled by the fact that the mother has been incarcerated for N. E. K.'s entire life and by the nature of the offense resulting in her incarceration. We also recognize that it may be that her parental rights should ultimately be terminated. But because the juvenile court's order does not set forth facts supporting its conclusion that the continuation of the existing relationship between N. E. K. and her mother will cause or is likely to cause serious physical, mental, moral, or emotional harm to N. E. K., we must reverse. See *Hewlett v. Hewlett*, 349 Ga. App. 267, 271 (825 SE2d 622) (2019) (termination of parental rights reversed where child was thriving in grandparents' home and there was no evidence that continuing relationship with mother, in some form, would harm the child); *In the Interest of K. J.*, 226 Ga. App. 303, 307-308 (2) (b) (486 SE2d 899) (1997) (termination of parental rights reversed where termination order recited that child was likely to suffer serious physical, mental, emotional, or moral harm, but it did not set forth any facts that would support this conclusion and there was no evidence that the child's relationship with incarcerated father was harmful); Compare *In the Interest of A. B.*, 362 Ga. App. 123, 130 (1) (b) (866 SE2d 847) (2021) (juvenile court relied on extensive evidence

that children would be harmed if they were returned to the mother's neglectful treatment and if they remained, without any permanency, in foster care).

2. In light of our holding in Division 1, we need not reach the issue of the best interest of the child under OCGA § 15-11-310 (b).

*Case No. A22A1472*

3. The father contends that the juvenile court erred in terminating his parental rights because the evidence does not support the judgment.

(a) We first consider whether the juvenile court erred in terminating the father's parental rights based on abandonment. As set forth above, to constitute abandonment, a parent's conduct must show an intent to abandon in light of the entire record. *In the Interest of H. A. S.*, 358 Ga. App. at 58-59 (2). We conclude that the record here does not support the juvenile court's finding that there was clear and convincing evidence that the father abandoned N. E. K. during the approximately 11 months between when the child came into DFACS custody and the termination hearing. The father completed all of his assessments, despite his incarceration, and although he did not pay child support to DFACS, he did arrange to have payments sent to N. E. K.'s maternal grandmother and gifts sent to N. E. K. In addition, the father has weekly

11

video visits with N. E. K. Under the circumstances, the required intent to abandon has not been shown. See *In the Interest of H. A. S.*, 358 Ga. App. at 59 (2).

(b) We next consider whether the juvenile court erred in terminating the father's parental rights on the basis of unremedied dependency. Again, we assume that there was sufficient evidence to support the juvenile court's findings as to the first three criteria of OCGA § 15-11-310 (a) (5) and consider the fourth – harm to the child. And as previously stated, an order terminating parental rights must contain explicit findings supporting the conclusion of serious physical, mental, moral, or emotional harm to the child. See *In the Interest of A. S.*, 339 Ga. App. at 881 (3).

As with the mother, there is no evidence in the record before us that maintaining the father's existing relationship with N. E. K. while she remains in the home of the maternal grandparents will itself cause N. E. K. harm. The maternal grandmother testified that the father's contact with N. E. K. was regular and that she would not be opposed to him maintaining contact at the conclusion of these proceedings, if it would have a positive impact on N. E. K.

We are of course concerned that the father has been incarcerated for years of N. E. K's young life and recognize that it may be that his parental rights should ultimately be terminated. But because the juvenile court's order does not set forth

facts supporting its conclusion that the continuation of the existing relationship between N. E. K. and her father will cause or is likely to cause serious physical, mental, moral, or emotional harm to N. E. K., we must reverse. See *Hewlett*, 349 Ga. App. at 271; *In the Interest of K. J.*, 226 Ga. App. at 307-308 (2) (b).

4. In light of our holding in Division 3, we need not reach the issue of the best interest of the child under OCGA § 15-11-310 (b).

*Judgments reversed. Miller, P. J., and Pipkin, J., concur*.